CRAIG G. MARGULIES (SBN 185925)
JEREMY W. FAITH (SBN 190647)
NINA Z. JAVAN (SBN 271392)
**MARGULIES FAITH, LLP**
16030 Ventura Boulevard, Suite 470
Encino, CA  91436
Telephone:  (818) 705-2777
Facsimile:  (818) 705-3777
Email:  Craig@MarguliesFaithLaw.com
Email: Jeremy@MarguliesFaithLaw.com
Email: Nina@MarguliesFaithLaw.com

[Proposed] Attorneys for  Gospel Light Publications
Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re | Case No. 9:15-bk-11586-PC |
| | Chapter 11 |
| GOSPEL LIGHT PUBLICATIONS, | **EMERGENCY MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER:** |
| Debtor and Debtor in Possession. | **(1) AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM BASIS PURSUANT TO CASH COLLATERAL AGREEMENT WITH SUPER G FUNDING, LLC;** |
| | **(2) GRANTING REPLACEMENT LIENS;** |
| | **(3) SCHEDULING A FINAL HEARING ON PERMANET USE OF CASH COLLATERAL; AND** |
| | **(4) AFTER HEARING, AUTHORIZING PERMANENT USE OF CASH COLLATERAL** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS THERETO** |
| | [Declaration of Dave Thornton, Chief Executive Officer, in Support of Emergency First Day Motions Filed Concurrently Herewith] |
| | Hearing To Be Set By Court |

EMERGENCY MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER AUTHORIZING USE OF
CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING THEREON

1
2

**TABLE OF CONTENTS**                                                    **Page**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.     INTRODUCTION ................................................................................................3

II.    JURISDICTION AND SUMMARY OF RELIEF REQUESTED ...................3

III.   GENERAL BACKGROUND ..........................................................................4

IV.    STATEMENT OF FACTS ..............................................................................4

    A.    The Debtor and its Business Operations .....................................................4

    B.    Events Leading to Bankruptcy ...................................................................5

    C.    Pre-Petition Liquidation Efforts ...............................................................7

    D.    The Debtor's Future Plans .......................................................................8

    E.    The Secured Creditors ............................................................................9

        i. The Super G Secured Claim ..............................................................9

        ii. The RRD Secured Claim .................................................................10

    F.    The Debtor's Need for Immediate Access to Cash ......................................10

V.    ARGUMENT ....................................................................................................12

    A.    The Debtor Should Be Authorized to Use the Cash Collateral Pursuant to 11
          U.S.C. § 363 to Operate, Maintain, and Preserve the Assets of the Estate ...12

    B.    Secured Creditors Are Adequately Protected .............................................13

    C.    Super G Will Have a Replacement Lien on the Assets .................................14

    D.    The Secured Creditors are Aquately Protected by the Debtor's Continued
          Operations ............................................................................................15

    E.    Emergency Relief Is Justified Under The Circumstances .............................17

VI.   CONCLUSION .................................................................................................18

1

## TABLE OF AUTHORITIES

2

<u>**CASES**</u>                                                                                            **Page**

3

In re Coody,
    59 B.R. 164, 167 (Bankr. M.D. Ga. 1986) ................................................................ 14

4

In re Dynaco Corp.,
    162 B.R. 389, 394 (Bankr. D.N.H. 1993) ........................................................... 12, 15

5

6

In re George Ruggiere Chrysler-Plymouth, Inc.,
    727 F.2d 1017, 1019 (11th Cir. 1984) ...................................................................... 17

7

In re Immenhausen Corp.,
    164 B.R. 347, 352 (Bankr. M.D. Fla. 1994) ............................................................. 15

8

9

In re Karl A. Neise, Inc.,
    16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) ................................................................ 15

10

In re McCombs Properties VI, Ltd.,
    88 B.R. 261, 266 (Bankr. C.D. Cal. 1988) .......................................................... 13, 15

11

In re Mellor,
    734 F.2d 1396, 1400 (9th Cir. 1984) ....................................................................... 13

12

13

In re Newark Airport/Hotel Ltd. Partnership,
    156 B.R. 444, 450 (Bankr. D.N.J. 1993) ................................................................. 15

14

In re O'Connor,
    808 F.2d 1393, 1398 (10th Cir. 1987) ............................................................... 13, 16

15

In re Pine Lake Village Apartment Co.,
    16 B.R. 750 (Bankr. S.D.N.Y. 1982) ....................................................................... 15

16

17

In re Pursuit Athletic Footwear, Inc.,
    193 B.R. 713 (Bankr. D. Del. 1996) ......................................................................... 15

18

In re Stein,
    19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) ........................................................... 12, 15

19

20

In re Triplett,
    87 B.R. 25 (Bankr. W.D. Tex. 1988) ........................................................................ 15

21

Robert Neier v. Clark Oil & Refining Corp. (In re Apex Oil Company),
    85 B.R. 538, 541 (Bankr. E.D. Mo. 1988) ............................................................... 13

22

23

Stein v. U.S. Farmers Home Administration (In re Stein),
    19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) ................................................................ 15

24

United Savings Association v. Timbers of Inwood Forest Associates,
    484 U.S. 365, 370 (1988) ............................................................................... 13, 14

25

26

27

28

## STATUES                                                      Page

11 U.S.C. § 102(1)......................................................................17

11 U.S.C. § 361(1)......................................................................13

11 U.S.C. § 361(2)......................................................................14

11 U.S.C. § 363 .............................................................8, 9, 12, 17

11 U.S.C. § 363(a)..............................................................12, 13

11 U.S.C. § 363(c)(1) ................................................................12

11 U.S.C. § 363(c)(2) .........................................................12, 13

11 U.S.C. § 363(c)(2)(A)............................................................12

11 U.S.C. § 363(c)(2)(B)............................................................12

11 U.S.C. § 363(c)(3)................................................................17

11 U.S.C. § 1107 ........................................................................4

11 U.S.C. § 1107(a)...................................................................12

11 U.S.C. § 1108 ..................................................................4, 12

28 U.S.C. § 157 ..........................................................................3

28 U.S.C. § 157(b)(2)(A) ............................................................3

28 U.S.C. § 157(b)(2)(M) ...........................................................3

28 U.S.C. § 157(b)(2)(O) ...........................................................3

28 U.S.C. § 1334 .......................................................................3

28 U.S.C. § 1408 .......................................................................3

28 U.S.C. § 1409 .......................................................................3

Wisconsin Statutes & Annotations 407.209 ..............................14

Wisconsin Statutes & Annotations 407.209(1)..........................14

## RULES                                                        Page

Federal Rules of Bankruptcy Procedure 4001(b)...........................1

Federal Rules of Bankruptcy Procedure 4001(b)(2) .................2, 18

Local Bankruptcy Rule 4001-2.................................................1, 11

**TO THE HONORABLE PETER H. CARROLL, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; SECURED CREDITORS; THE CREDITORS APPEARING ON THE LIST FILED IN ACCORDANCE WITH RULE 1007(D) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; AND PARTIES REQUESTING SPECIAL NOTICE:**

Gospel Light Publications (the "Debtor"), the debtor and debtor in possession in the above-captioned bankruptcy case (the "Bankruptcy Case") respectfully moves the Court for an emergency order  (1) authorizing use of cash collateral on an interim basis pursuant to the "Loan Restructure, Discount Payoff and Cash Collateral Agreement" (the "Cash Collateral Agreement")(attached as **Exhibit "1"**) with Super G Funding, LLC ("Super G"); (2) approving the Cash Collateral Agreement; (3) granting Super G replacement liens in property of the estate; and (4) setting a hearing for final approval of cash collateral use by the Debtor (the "Cash Collateral Motion").

The Cash Collateral Motion is brought pursuant to 11 U.S.C. § 363(c)(2)(B) and (c)(3), Federal Rule of Bankruptcy Procedure (F.R.B.P.) 4001(b), and Local Bankruptcy Rule 4001-2 in accordance with the budget attached as **Exhibit "A"** to the Cash Collateral Agreement (the "Budget") on the grounds that the Debtor's immediate use of Cash Collateral (as further defined in the Memorandum of Points and Authorities, below) is (i) within the Debtor's sound business judgment, (ii) in the best interest of the estate and its creditors, (iii) critical to the Debtor's business operations, and (iv) essential to the Debtor's successful reorganization in this Bankruptcy Case.

The Cash Collateral Motion is based on the attached Memorandum of Points and Authorities, the concurrently-filed Declaration of Dave Thornton, Chief Executive Officer, in Support of Emergency First Day Motions (the "Thornton Declaration"), the notice of motion to be filed once a hearing date is obtained from the Court, the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Cash Collateral Motion.

As directed by the Court, the Debtor will give telephonic or facsimile notice of the date, time and location of the emergency hearing on the Cash Collateral Motion to all parties holding or asserting a security interest in Cash Collateral, the Office of the United States Trustee, and creditors listed on the Debtor's list of 20 largest unsecured claims, immediately upon receipt of the hearing information from the Court. To the extent necessary, the Debtor requests that pursuant to L.B.R. 9075-1(a)(6), the Court permit service of the Cash Collateral Motion (in addition to the means of service set forth in such Local Bankruptcy Rule) by overnight delivery.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order:

(1) Granting this Cash Collateral Motion in its entirety;

(2) Authorizing the Debtor to use Cash Collateral pursuant to 11 U.S.C. § 363(c)(2)(B) and (c)(3) and F.R.B.P. 4001(b)(2), on an interim basis pursuant to the Cash Collateral Agreement;

(3) Granting Super G replacement liens on property of the Debtor's estate in connection with the Debtor's use of cash collateral of Super G during the interim period;

(4) Setting a final hearing to approve permanent use of Cash Collateral and final approval of the Cash Collateral Agreement; and

(5) Granting such other and further relief as this Court deems just and proper under the circumstances.

Dated: August 10, 2015                    **MARGULIES FAITH, LLP**


By:    */s/ Jeremy W. Faith*
       JEREMY W. FAITH
       CRAIG G. MARGULIES
       NINA Z. JAVAN
       [Proposed] Attorneys for Gospel Light
       Publications, Chapter 11 Debtor and
       Debtor in Possession

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### INTRODUCTION

4      The Debtor respectfully requests interim approval of use of cash collateral

5   pursuant to an agreement with Super G,[1] its pre-petition lender, pursuant to the Loan

6   Restructure, Discount Payoff and Cash Collateral Agreement (*i.e.*, the Cash Collateral

7   Agreement), which is attached hereto as **Exhibit "1"**.  Interim use of Cash Collateral is

8   required to sustain the continued operations of the Debtor.  As more fully explained

9   below, entry of such an order on an emergency basis is necessary to prevent a severe

10  disruption, if not cessation, of the Debtor's operations.  Such occurrence would result in

11  irreparable harm and loss to the bankruptcy estate.  Accordingly, the Debtor respectfully

12  requests interim approval of Cash Collateral use pursuant to the terms of the Cash

13  Collateral Agreement and the setting of final hearing on use of Cash Collateral on or

14  before September 4, 2015.

15                        II.

16      ### JURISDICTION AND SUMMARY OF RELIEF REQUESTED

17      This Court has jurisdiction to consider the Cash Collateral Motion under 28 U.S.C.

18  §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),

19  (M) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

20  By this Cash Collateral Motion, the Debtor seeks authority to use Cash Collateral to pay

21  its ordinary and necessary operating expenses in order to continue its business

22  operations for the purpose of preserving the value of its assets pending a sale of any and

23  all of those assets, which will inure to the ultimate benefit of the estate and its creditors.

24  The statutory predicates for the relief requested herein are 11 U.S.C. §§ 363(c)(2)(B) and

25  (c)(3), under which the Debtor seeks authority to use Cash Collateral.

26  _____

27      [1] Capitalized terms not otherwise defined herein shall have the same meaning as in the motion to
which this memorandum of points and authorities is annexed.

28
EMERGENCY MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER AUTHORIZING USE OF
CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING THEREON
- 3 -

### III.

### GENERAL BACKGROUND

The Debtor commenced this case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on August 7, 2015 (the "Petition Date").  The Debtor continues to carry out its business operations and manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No trustee, examiner, or committee has been appointed in the Bankruptcy Case.

### IV.

### STATEMENT OF FACTS

**A.      The Debtor and its Business Operations**

Founded in 1933, the Debtor is a mid-market Christian media company specializing in the production of print and digital media educational resources to meet the needs of church leaders throughout the world.  The Debtor is particularly well-known for its high-quality Vacation Bible School and Sunday School curriculum materials.  The Debtor serves approximately 14,000 customers per year, through a combination of direct sales (via website and phone orders) and distributors.  A large portion of these customers are churches and schools.

The Debtor operates out of leased offices located at 1923 Eastman Avenue, Ventura, California 93003 (the "Offices") which it has occupied since 2015.  As of the Petition Date, the Debtor has trimmed its head count to 14 employees, some of whom have been with the Debtor since the 1980s.  The Debtor's employees handle  the  Debtor's customer service, sales, marketing, and operations functions.

The Debtor's fulfillment and warehousing needs are met offsite by a third party, R.R. Donnelly & Sons ("RRD").  RRD provides warehousing, assembly and distribution services to the Debtor from a facility in Appleton, Wisconsin (the "Warehouse").  RRD also provides offsite printing services to the Debtor.

///

1  The Debtor's most significant assets are its Sunday School Curriculum (the

2  "Sunday School Asset") [2], its Vacation Bible School Curriculum (the "Vacation Bible

3  School Asset")[3], and its Ministry Resource Line (the "Ministry Asset").  The Sunday

4  School Asset operates on a subscription model, with customers dependent on receiving

5  new materials every three (3) months.  The materials for the next shipment of the

6  Sunday School Asset arrived in the Warehouse at the end of July 2015, with shipment of

7  the assembled materials to customers estimated to be completed by the end of August

8  2015.  Although it does not operate under the same model as the Sunday School Asset,

9  customers of the Ministry Asset are also dependent upon continuous services and the

10  availability of resources provided by the Debtor.

11  **B. Events Leading to Bankruptcy**

12  A number of unanticipated occurrences during the last nine months, combined

13  with a long term slowdown in the Christian publishing market, led to the Debtor's need

14  for Chapter 11 relief.  Prior to December of 2014, Crestmark Bank ("Crestmark")

15  provided the Debtor with working capital ranging from $1,000,000.00 to $3,000,000.00

16  annually.  In or around early November 2014, Crestmark notified the Debtor that it did

17  not believe the Debtor would be able to satisfy certain loan covenants, which included

18  retaining a $1,000,000.00 cash balance at all times, and provided the Debtor with notice

19  that Crestmark would no longer provide working capital effective January 2015.  At that

20  time, the Debtor needed to find an alternate source of working capital to pay fulfillment

21  invoices related to its Vacation Bible School line which were coming due in January

22  2015.

23  In December of 2014, the Debtor and Super G entered into a short-term financing

24  agreement whereby Super G provided the Debtor with a business loan in the amount of

25
26  [2] The Sunday School Asset had 4,220 direct customers in 2014 and generated total net revenue of $3,664,125.
27  [3] The Vacation Bible School Asset, which has impacted the lives of more than sixty-five million children since 1952, had 4,427 direct customers in 2014 and generated $2,055,396.00 in total net revenue.
28

$1,200,000.00 (the "Super G Loan"). The Super G Loan allowed the Debtor to finalize the January 2015 production of the Vacation Bible School publication.

Shortly after entering into the Super G Loan, one of the Debtor's largest customers, Family Christian Stores, filed a Chapter 11 bankruptcy petition on February 11, 2015.[4] As a result of the Family Christian Stores' bankruptcy, the Debtor did not receive approximately $143,000.00 in expected income, which it was forced to write off.

In addition to the loss of the Family Christian Stores revenue, an issue with the Debtor's web developer also came to a head in February of 2015. In October of 2014, the Debtor retained Bit-Wizards Information Technology Solutions, Inc. ("Bit-Wizards") to design a new, responsive website for the Debtor using a different software platform. Bit-Wizards originally estimated a project cost of approximately $160,000.00 and a projected "Go-Live" date for the new site of January 1, 2015. However, the new site was not deployed until February 14, 2015, by which time Bit-Wizards had billed almost $300,000.00, which was significantly over budget and more than the Debtor had anticipated. Further, the site continued to experience difficulties after deployment which, combined with the delayed launch, resulted in an estimated loss of $120,000.00 of anticipated revenue during the period from January 2015 to June 2015.[5]

Finally, in late April 2015, Insperity, the Debtor's employment services provider, changed the terms of the agreement with the Debtor by requiring the Debtor to begin pre-paying for payroll. This unanticipated modification to the agreement with Insperity further harmed the Debtor's cash flow by necessitating an immediate payment of $85,000.

---

[4] This case is pending before the United States Bankruptcy Court for the Western District of Michigan (Grand Rapids) as In re Family Christian, LLC, Case Number 15-00643-jtg (jointly administered with In re Family Christian Holding, LLC, Case Number 15-00642 and In re FCS Giftco, LLC, Case Number 12-00644)

[5] Sales through the website are particularly important to the Debtor's cash flow since they are largely credit card sales, which result in immediate payment of the amounts due, rather than payment on credit terms (e.g., 30-day invoicing).

The combination of the foregoing events dropped the Debtor's cash balance in April 2015 to the point that it had to default on its payments under the Super G Loan. The Debtor was also unable to make certain payments under its long term obligation to its warehouse and fulfillment company, RRD.  With the slowdown in the market for Christian publishing, the Debtor did not foresee a means of continuing to operate under its current business model.  Thus, by late April 2015, the Debtor began actively exploring a liquidation strategy in order to maximize the value of its assets for the benefit of creditors.

### C. Pre-Petition Liquidation Efforts

The Debtor has been actively involved in efforts to liquidate its various assets over the last 8 months.  In December 2014, the Debtor's board of directors authorized its Chief Executive Officer, Dave Thornton ("Mr. Thornton"), to explore the sale of the Debtor's membership interest in ZDL Holdings, LLC, a North Carolina Corporation ("ZDL").  ZDL does business in China publishing Christian literature and providing consulting services.  The Debtor owns a sixty-three percent (63%) membership interest in ZDL (the "ZDL Asset").

Mr. Thornton approached multiple Christian publishers[6] that expressed an interest in exploring this business opportunity.  Although a pre-petition sale of the ZDL Asset could not be finalized, the Debtor was able to enter into an agreement (the "ZDL APA") to sell the ZDL Asset to ZDL's thirty-seven percent (37%) co-owner, Pacific Resources International, LLC ("PRI").  Pursuant to the ZDL APA, which contemplates the instant Bankruptcy Case, PRI will purchase the ZDL Asset for a total purchase price of $175,000.00 (the "ZDL Purchase Price").  Of the ZDL Purchase Price, $100,000.00 has already been paid to the Debtor as a good faith payment, and the remaining $75,000.00

---

[6] Due to Non-Disclosure Agreements signed by the various parties, the specific companies approached and/or whom seriously explored the possibility of purchase of the ZDL Asset are not identified by name here.

1  is to be paid at closing.  The Debtor will seek approval of the ZDL APA pursuant to a

2  noticed motion under 11 U.S.C. § 363.

3        After the impact of the Family Christian Stores bankruptcy case, and once the

4  difficulty in obtaining future working capital became apparent, in March 2015, the

5  Debtor's board of directors authorized Mr. Thornton to pursue additional asset sales.

6  From March through July of 2015, Mr. Thornton marketed the Debtor's assets by

7  approaching all of the large Christian publishing companies to explore their interest in a

8  purchase of some or all of the remaining assets.  Beginning in April 2015, the Debtor

9  engaged in serious talks with a potential purchaser for the sale of substantially all the

10  Debtor's remaining assets.  Although the Debtor ultimately received an offer from the

11  potential purchaser in June 2015, it was determined both that the purchaser would not

12  be able to complete its due diligence within a reasonable timeline, and that a sale of the

13  Debtor's assets in smaller parcels would result in a greater return.  Thus, since mid-June

14  2015, the Debtor has solicited interest from other parties under an asset segregation

15  strategy.  While none of these parties agreed to sign an asset purchase agreement prior

16  to the instant bankruptcy filing, it is believed that most would be active bidders in an

17  auction in the Bankruptcy Case.

18        **D.**    **The Debtor's Future Plans**

19        Through this Bankruptcy Case, the Debtor intends to operate its business to

20  maintain the value of its assets while pursuing the sale of substantially all its assets.  The

21  value of the Debtor's assets depends on the Debtor remaining a going concern through

22  the Debtor's various sale cycles. In particular, the Sunday School Asset would be

23  detrimentally impacted if the Debtor did not maintain its operations, as it is structured as

24  a subscription model, with the most recent large shipment departing the Warehouse

25  throughout August 2015.  If the Debtor were to discontinue business operations and

26  close its doors, customers previously purchasing the Sunday School Asset would

27  immediately seek alternate providers of such services and materials, thus diminishing the

28

1  saleable value of the Sunday School Asset to the mere liquidation value of any existing

2  inventory.[7]

3  　　While continuing operations as a debtor in possession, the Debtor will continue to

4  market its remaining assets.  The Debtor intends to propose a liquidating Chapter 11

5  Plan, while selling certain assets in the near-term through Section 363 sales.

6  　　The Debtor has hired competent bankruptcy counsel to prepare its schedules,

7  plans to comply with the United States Trustee monthly reporting requirements, and will

8  propose a feasible chapter 11 plan of liquidation which will provide value to the estate for

9  the benefit of creditors.  The Debtor's Chapter 11 filing is made in good faith.

10  **　　E.　　The Secured Creditors**

11  　　The Debtor's two primary secured creditors that assert an interest in cash

12  collateral are RRD[8] and Super G. The Debtor has a number of creditors with security

13  interests in specific equipment and software.  The Debtor does not intend to generate or

14  use any cash collateral with respect to the lien interests of these other creditors.

15  **　　i.  The Super G Secured Claim**

16  　　The Debtor was initially indebted to Super G pursuant to a Promissory Note dated

17  December 22, 2014, in the principal amount of $1,200,000, and a Business Loan &

18  Security Agreement dated December 22, 2014, between the Debtor and Super G (*i.e.,*

19  the Super G Loan).  The Debtor's obligation under the Super G Loan is secured by a first

20  priority security interest against substantially all of the Debtor's assets (the "Super G

21  Lien") pursuant to UCC-1 Financing Statements filed on December 31, 2014, and May 6,

22  2015.

23  *///*

24

---

25  　　[7] The Debtor estimates that this would reduce the value of the Sunday School Assets to 5-10% of
their going concern value.

26  　　[8] In addition to RRD's secured claim, RRD also has an unsecured claim in the approximate
amount of $1,990,159.42 pursuant to a forbearance agreement dated December 16, 2011, and a second

27  unsecured claim in the approximate amount of $102,668.20 for printing services.

28

1  As of July 30, 2015, the Debtor estimates that the remaining amount owing under

2  the Super G Loan is $692,371.84.  RRD has signed a subordination agreement in favor

3  of Super G as to the Super G Loan.  On August 4, 2015, in contemplation of bankruptcy,

4  the Debtor and Super G modified the Super G Loan by entering into the Loan

5  Restructure, Discount Payoff and Cash Collateral Agreement (the "Cash Collateral

6  Agreement").  Among other things, and as more fully discussed below, the Cash

7  Collateral Agreement fixes the Super G Secured Claim at $655,000.00, and provides

8  consent to the Debtor's use of Cash Collateral for a period of 120 days pursuant to

9  certain terms.

10  ### ii.  The RRD Secured Claim

11  RRD asserts a secured claim against the Debtor's inventory that is located in

12  RRD's Warehouse based on a statutory warehouseman's lien under Wisconsin law.  The

13  Debtor believes the outstanding balance of the RRD secured claim is approximately

14  $55,034.53.  RRD's asserted warehouseman's lien is junior to the Super G secured

15  claim based on an agreement between Super G and RRD whereby RRD subordinated

16  its security interest in the Debtor's assets to Super G's lien.

17  ### F.    The Debtor's Need for Immediate Access to Cash

18  The Debtor's immediate access to cash is absolutely critical to maintaining the

19  Debtor's business operations, which in turn affects the going concern value of the

20  Debtor's assets.  At this time the Debtor requires the use of cash to pay ordinary

21  expenses associated with the Debtor's business operations, including, but not limited to,

22  funding payroll and other employee-related obligations, and procuring goods and

23  services necessary for operating without interruption.  Not only will the maintenance of

24  the Debtor's business operations, pending a sale of certain of the Debtor's assets,

25  preserve the value of the Debtor's assets to maximize the value that the Estate will

26  receive in any sale, but the income generated by the Debtor through retail sale of its

27

28

1  inventory and collection on its accounts receivable will allow the Debtor to fund its plan of

2  reorganization.  However, none of this is possible without the use of cash collateral.

3      The Debtor is informed and believes that Super G asserts a secured interest in all

4  the Debtor's assets (collectively, the "<u>Assets</u>"), and the rents, profits and proceeds

5  therefrom (the "<u>Cash Collateral</u>"), and that RRD may assert a secured interest in any of

6  the Debtor's inventory stored at the Warehouse (the "<u>Inventory</u>", which is a component of

7  the Assets).

8      A true and correct copy of the Debtor's projected cash flow and budget (*i.e.,* the

9  Budget) for the months of August 2015 through, and including, November 2015, is

10 attached as **<u>Exhibit "A"</u>** to the Cash Collateral Agreement.  The Budget contains the

11 minimum expenses which the Debtor must incur to maintain its business operations at a

12 level that will preserve and maximize the value of the Assets.   No extraordinary

13 expenses are included and the proposed expenditures are necessary and proper.  The

14 Debtor currently has no present alternative source of funds to operate its business.  In

15 sum, the failure to obtain authorization for use of the Cash Collateral will be fatal to the

16 Debtor and its attempt to reorganize, and will be disastrous to its creditors, both secured

17 and unsecured.  In contrast, use of the Cash Collateral will ensure the timely payment of

18 employee-related obligations, thus maintaining employee morale and hedging against

19 the loss of critical personnel, and will foster ongoing cooperation from suppliers, vendors,

20 and employees to ensure an orderly reorganization.

21     The Debtor has reached an agreement with Super G, through the Cash Collateral

22 Agreement, attached as **<u>Exhibit "1"</u>**, for use of the Cash Collateral through the end of

23 November 2015.   The Debtor seeks approval of the Cash Collateral Agreement as a

24 stipulation for the use of the Cash Collateral, and has concurrently filed a statement,

25 pursuant to L.B.R. 4001-2, regarding the agreement.

26 ///

27 ///

28

**V.**

**ARGUMENT**

**A. The Debtor Should Be Authorized to Use the Cash Collateral Pursuant to 11 U.S.C. § 363 to Operate, Maintain, and Preserve the Assets of the Estate**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section … 1108… of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).   A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and any entity other than the estate have an interest…"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if "each entity that has interest in such cash collateral consents; or . . . the court, after notice and a hearing, authorizes such use, sale or lease."  See 11 U.S.C. § 363(c)(2)(A) and (B). Where a debtor is operating a business, it is extremely important that access to cash collateral be allowed in order to facilitate the goal of reorganization, as "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business".  In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).  The Debtor has determined that it would clearly be in the best interest of the estate and its creditors to continue to

1   maintain its business operations, pending a sale of some or all of the Assets, as the value

2   of the Assets will be greatly diminished if the Debtor does not continue as an operating

3   concern, and funding for the reorganization will be obtained, at least in part, from ongoing

4   business operations. Accordingly, the Court should authorize the Debtor to use the Cash

5   Collateral to continue to maintain its business operations because the interests of secured

6   creditors, if any, will be adequately protected, and such use is in the best interest of the

7   Debtor's estate and its creditors.

8        **B. Secured Creditors Are Adequately Protected.**

9        To the extent that an entity has a valid security interest in the revenues generated

10  by property, those revenues constitute "cash collateral" under 11 U.S.C. § 363(a).

11  Pursuant to § 363(c)(2), the Court may authorize the debtor to use a secured creditor's

12  cash collateral if the secured creditor is adequately protected. In re Mellor, 734 F.2d

13  1396, 1400 (9th Cir. 1984); see also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir.

14  1987); In re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

15  Under United Savings Association v. Timbers of Inwood Forest Associates, 484 U.S. 365

16  (1988) and subsequent case law, the property interest that a debtor must adequately

17  protect pursuant to § 361(1) and (2) is **only** the value of the lien that secures the

18  creditor's claim.  Id.; see also McCombs, 88 B.R. at 266 (stating that section 506(a)

19  "limit[s] the secured status of a creditor (*i.e.*, the secured creditor's claim) to the lesser of

20  the [allowed amount of the] claim or the value of the collateral").  Similarly, in Robert

21  Neier v. Clark Oil & Refining Corp. (In re Apex Oil Company), 85 B.R. 538, 541 (Bankr.

22  E.D. Mo. 1988), the Bankruptcy Court, relying exclusively on Timbers, denied adequate

23  protection to a husband and wife holding over-secured claims because "[n]o evidence

24  was presented that the value of the [collateral] would diminish during the course of [the]

25  Chapter 11 proceeding."  Id.

26       With respect to the security interest asserted by Super G in the Assets, Super G

27  has consented to the use of the Cash Collateral under the Cash Collateral Agreement, of

28

1  which this Cash Collateral Motion also seeks approval.  The Cash Collateral Agreement

2  does not require the Debtor to make adequate protection payments to Super G.

3      RRD has asserted a warehouseman's lien on the warehoused Inventory.  Since

4  the Inventory is warehoused in Wisconsin, Wisconsin state law applies to determine the

5  nature and extent of any security interest.  Pursuant to W.S.A. § 407.209, to the extent

6  that RRD has a valid warehouseman's lien, the amounts and charges secured would be

7  limited to those charges relating directly to the warehoused inventory.[9]  The Debtor

8  requests that RRD be granted replacement liens in collateral of the Debtor to the same

9  extent and validity of its pre-petition lien.  In addition, and as further discussed below,

10  where (as in the present case) the continuation of the Debtor's business operations

11  preserves the value of the creditor's alleged collateral, the Debtor's continued operation

12  itself constitutes adequate protection of the secured creditor's interests in the collateral.

13  See, e.g., In re Coody, 59 B.R. 164, 167 (Bankr. M.D. Ga. 1986).  All alleged security

14  interests are therefore adequately protected by the operation of the Debtor's business,

15  which will maintain the value of the Debtor's Assets, including, but not limited to those

16  portions of the Assets (such as the Sunday School Assets), which operate on a

17  subscription model and require the provision of continuous resources and services in

18  order to maintain the customer base.

19      **C.  Super G Will Have a Replacement Lien on the Assets**

20      Section 361 of Bankruptcy Code explicitly provides that "adequate protection may

21  be provided by . . . [a] replacement lien to the extent that such . . . use [of cash collateral]

22  results in a decrease in the value of such entity's interest in such property."  11 U.S.C. §

23  361(2); See Timbers, 484 U.S. at 370.  Pursuant to the Cash Collateral Agreement, as

24  further adequate protection for its security interest, Super G will have a continuing lien in

25

26      [9] In point of fact, each lot of goods would only secure the charges related to that lot of goods,
    further limiting the amount of RRD's potential lien.  In other words, later lots of goods would not secure

27  charges related to earlier lots, absent some language in an agreement between the Debtor and RRD to the
    contrary, which does not exist.  See W.S.A. § 407.209(1).

28

1 the Assets, and a post-petition replacement lien in the post-petition rents, profits, and

2 proceeds therefrom.

3    **D. The Secured Creditors are Adequately Protected by the Debtor's**

4    **Continued Operations.**

5    The preservation of the value of a secured creditor's lien is sufficient to provide

6 adequate protection to a secured creditor when a debtor seeks to use cash collateral.  In

7 re Triplett, 87 B.R. 25 (Bankr. W.D. Tex. 1988); see also Stein v. U.S. Farmers Home

8 Administration (In re Stein), 19 B.R. 458 (Bankr. E.D. Pa. 1982).  In Stein, the Court found

9 that, as a general rule, a debtor may use cash collateral where such use would enhance

10 or preserve the value of the collateral, and allowed the debtor therein to use cash

11 collateral even though the secured party had no equity cushion for protection.  Id.  The

12 Stein Court determined that the use of cash collateral was necessary to the continued

13 operations of the debtor, and that the creditor's secured position could only be enhanced

14 by the continued operation of the debtor's business.  Id. at 460.  Similar positions have

15 been taken by a number of other courts.  See, e.g., In re McCombs, supra (determining

16 that the debtor's use of cash collateral for needed repairs, renovations and operating

17 expenses eliminated the risk of diminution of the creditor's interest in the cash collateral

18 and that such use would more likely increase cash collateral); In re Pine Lake Village

19 Apartment Co., 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (Debtors permitted to use cash

20 collateral generated from rental income to enhance the value of real property and secured

21 creditor's claim); In re Karl A. Neise, Inc., 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981)

22 (marginally secured creditor adequately protected by lien in post-petition property

23 acquired by debtors and debtors were permitted to use cash collateral "in the normal

24 course of their business"); In re Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D.

25 Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J.

26 1993); In re Dynaco, 162 B.R. at 394-95 (Bankr. D.N.H. 1993); In re Immenhausen Corp.,

27 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

28

1   In the instant case, the Debtor's continued use of Cash Collateral pursuant to the

2   Budget attached as **Exhibit "A"** to the Cash Collateral Agreement will ensure that the

3   "going concern" value of the Assets is preserved, a value substantially greater than the

4   value which would be realized from a liquidation of those Assets if the Debtor were forced

5   to immediately cease operations and lay off all the employees.   The Debtor's continued

6   business operations will further adequately protect Super G and RRD because the Debtor

7   will continue to generate revenue with which to fund a reorganization and repay creditors,

8   and will continue to preserve the Assets which secure the creditors' liens.   Additionally, in

9   determining adequate protection, Courts have stressed the importance of promoting

10   debtors' reorganization, and the continued use of the Cash Collateral is a necessary

11   predicate to the Debtor's reorganization.   As the Tenth Circuit In re O'Connor court stated:

12   In this case, Debtors, in the midst of a Chapter 11 proceeding, have
proposed to deal with cash collateral for the purpose of enhancing the
13   prospects of reorganization.   This quest is the ultimate goal of Chapter 11.
Hence, the Debtors' efforts are not only to be encouraged, but also their
14   efforts during the administration of the proceeding are to be measured in
light of that quest.   Because the ultimate benefit to be achieved by a
15   successful reorganization inures to all the creditors of the estate, a fair
opportunity must be given to the Debtors to achieve that end.   Thus, while
16   interests of the secured creditor whose property rights are of concern to the
court, the interests of all other creditors also have bearing upon the
17   question of whether use of cash collateral shall be permitted during the
early stages of administration.

18   In re O'Connor, 808 F.2d at 1937.   With the continued use of the Cash Collateral, the

19   Debtor can continue to operate its business to implement an effective reorganization

20   strategy, which will include preserving and maximizing the value of the Assets for the

21   benefit of the Debtor's creditors.   Without the use of the Cash Collateral, the Debtor will

22   need to immediately cease business operations, would have to terminate all its

23   employees, and would not be able to continue in a Chapter 11 case.   The Assets would

24   then get sold at fire sale rates in a Chapter 7 case or Super G would take control of all the

25   Assets and sell them in order to satisfy its own claim, which would likely result in a lack of

26   funds to satisfy the claims of unsecured creditors.   In short, the Estate and the unsecured

27   creditors would suffer irreparable harm.   Rather than forcing the Debtor and its creditors

28

1  into such a dire situation at this early stage of the Bankruptcy Case, this Court should

2  permit the Debtor to use any Cash Collateral in order to preserve the ability to reorganize

3  in a way that benefits creditors the most.  In re George Ruggiere Chrysler-Plymouth, Inc.,

4  727 F.2d 1017, 1019 (11th Cir. 1984) ("Without the availability of cash to meet daily

5  operating expenses such as rent, payroll, utilities, etc. the congressional policy favoring

6  rehabilitation over economic failure would be frustrated.").

7         **E.  Emergency Relief Is Justified Under The Circumstances**

8         The authorization to use the Cash Collateral pending a final hearing will preserve

9  the value of Debtor's Assets only if authorization is granted immediately and on shortened

10 notice.   If there is any interruption in the Debtor's ability to pay their expenses, the

11 Debtor's ability to reorganize and pay future expenses during the pendency of the

12 Bankruptcy Case will be significantly impaired, to the serious harm and detriment of the

13 Debtor and secured creditors.

14        When it enacted section 363 of the Bankruptcy Code, Congress specifically

15 recognized that it might be necessary to schedule hearings on an expedited basis for

16 requests for interim authorization to use cash collateral due to the exigencies of individual

17 cases.  Section 363(c)(2)(B) authorizes the use, sale, or lease of cash collateral "after

18 notice and a hearing," and § 363(c)(3) provides, in pertinent part, that "[a]ny hearing

19 under paragraph (2)(B) . . . may be a preliminary hearing or may be consolidated  with a

20 hearing under subsection (e) of this section, but shall be scheduled in accordance with

21 the needs of the Debtors [and] . . . . [t]he court shall act promptly on any request for

22 authorization under paragraph (2)(B) of this subsection." 11 U.S.C. §363(c)(3); see also

23 11 U.S.C. § 102(1) (defining "after notice and a hearing" to mean after such notice and

24 such opportunity for a hearing as is appropriate in the particular circumstances of a given

25 case).

26        In this instance, the Debtor must have immediate use of the Cash Collateral in

27 order to continue its business operations so to avoid irreparable harm to the Assets and

28

the Estate and its creditors.  The Debtor needs to be able to pay its operating costs, such as employee-related obligations, utilities, and the like, in order to maintain itself as a going concern and preserve the value of its Assets, particularly those Assets that operate on a subscription model.  If the Debtor is not permitted to use the Cash Collateral, it will be unable to pay its operating costs and will be forced to close its doors, thus diminishing the value of a good portion of the Assets (including, but not limited to, the Sunday School Assets).  Given the immediate need for use of the Cash Collateral, the Debtor contends that relief on an emergency basis is justified under the circumstances and seek this Court's immediate authorization for the use of the Cash Collateral on an interim basis pending further order of the Court.

**VI.**

**CONCLUSION**

The Debtor submits that use of the Cash Collateral is necessary and proper in this case.  If the Debtor cannot use the Cash Collateral to maintain its business operations, the value of the most significant of the Debtor's assets will be reduced to at no more than one tenth (1/10) of their value on a going concern basis, thus irreparably harming the Estate and its creditors.  Further, the use of the Cash Collateral for the requested purposes is appropriate because the maintenance of the Debtor's business operations will provide additional protection to the secured creditors herein, by enabling operations without disruption, thereby preserving the value of the Estate's Assets and continuing to generate revenue.  Accordingly, the Debtor must be permitted to pay its expenses in the ordinary course.  Based upon the foregoing, the Debtor respectfully requests that the Court:

(1) Granting this Cash Collateral Motion in its entirety;

(2) Authorizing the Debtor to use Cash Collateral pursuant to 11 U.S.C. § 363(c)(2)(B) and (c)(3) and F.R.B.P. 4001(b)(2), on an interim basis pursuant to the Cash Collateral Agreement;

(3) Granting Super G replacement liens on property of the Debtor's estate in connection with the Debtor's use of cash collateral of Super G during the interim period;

(4) Setting a final hearing to approve permanent use of Cash Collateral and final approval of the Cash Collateral Agreement; and

(5) Granting such other and further relief as this Court deems just and proper under the circumstances.

Dated:  August 10, 2015                    **MARGULIES FAITH, LLP**

By:   _/s/ Jeremy W. Faith_
      CRAIG G. MARGULIES
      JEREMY W. FAITH
      NINA Z. JAVAN
      [Proposed] Attorneys for Gospel Light
      Publications, Chapter 11 Debtor and Debtor
      in Possession

# EXHIBIT 1

# Loan Restructure, Discount Payoff and Cash Collateral Agreement

This Loan Restructure and Payoff Agreement ("<u>Agreement</u>") is made by and between the following entities and people:

Gospel Light Publications also known as Gospel Light Inc., a California corporation ("<u>Gospel Light</u>" or "<u>Borrower</u>");

Doris Jane Greig and Gary Stanley Greig ("<u>Guarantors</u>") (collectively, with Gospel Light, the "<u>Gospel Light Parties</u>"); and

Super G Funding, LLC ("<u>Super G</u>" or "<u>Lender</u>").

The foregoing parties to this Agreement are sometimes referred to herein individually as a "Party" or collectively as "Parties."  This Agreement is dated August 4, 2015 for reference purposes only.

This Agreement is made with respect to the following facts set forth in the recital paragraphs A though G below (individually, a "<u>Recital</u>" and, collectively, the "<u>Recitals</u>").

## RECITALS

A.    Gospel Light has borrowed funds from Super G pursuant to a Promissory Note dated December 22, 2014, executed by Gospel Light in the principal amount of $1,200,000 (the "<u>Note</u>") and Business Loan & Security Agreement dated December 22, 2014, between Gospel Light and Super G (the "<u>Business Loan Agreement</u>").  The Guarantors have executed a Personal Guaranty dated December 22, 2014 (the "<u>Guaranty</u>") absolutely and unconditionally guaranteed all "obligations" of Gospel Light under the Business Loan Agreement and the Note.

B.    Super G has a valid, perfected and unavoidable first priority security interest against substantially all of Gospel Light's assets (the "<u>Super G Lien</u>") pursuant to: (1) the Business Loan Agreement; (2) that letter agreement between Super G and R.R. Donnelley & Sons Company whereby R.R. Donnelley & Sons Company and its related and affiliated companies ("<u>RRD</u>") agreed that the interests and lien of RRD in the property and assets of Gospel Light are and shall be subordinate to the liens of Super G in such property and assets; and (3) UCC-1 Financing Statements filed on December 31, 2014, and May 6, 2015, in the Office of the California Secretary of State (both, the "<u>Super G UCC-1 Financing Statement</u>")(all, collectively, the "<u>Security Documents</u>").

C.    As of July 30, 2015, Gospel Light's indebtedness consists of:

- Remaining amount due: $692,371.84 (principal and contract nondefault interest), plus
- Late Fees on missed payments, plus;

1

**EXHIBIT 1**                    **Page 20 of 37**

- 5% default interest on the "Unpaid Obligations"; and plus
- Accruing attorneys' fees

D.      Super G claims that Gospel Light is presently in default under the terms of the Note and Business Loan Agreement.  Gospel Light has informed Super G that it does not have the ability to perform under the terms of the Note and Business Loan Agreement.  Gospel Light has informed Super G that it intends to sell all of its assets in the context of a bankruptcy case filed under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Case").   The Bankruptcy Case will be filed in the United States Bankruptcy Court for the Central District of California, Northern Division (the "Bankruptcy Court").  Gospel Light anticipates that the sale of Gospel Light's assets will be conducted in the Bankruptcy Case through one or more auction sales held pursuant to 11 U.S.C. § 363 (the "Bankruptcy Sales"). Gospel Light intends one such sale to be of Gospel Light's 63% membership interest in ZDL Holdings, LLC (the "ZDL Membership").  Presently, the proposed bidder for the ZDL Membership is Pacific Resources International, LLC (the "PRI").   PRI currently owns 37% of ZDL Holdings, LLC.  PRI's proposed purchase price for the ZDL Membership is $175,000, of which PRI has already paid to Gospel Light $100,000.00 (the "PRI Deposit").

E.      Gospel Light and the Guarantors have requested that Super G restructure the Note and Business Loan Agreement and support Gospel Light's efforts and goals in the Bankruptcy Case, including the occurrence and consummation of the Bankruptcy Sales, and confirmation of a liquidating plan of reorganization (the "Liquidating Plan").

F.      Super G has agreed to provide certain modifications to the Note and Business Loan Agreement and cooperate with Gospel Light in the Bankruptcy Case to effectuate the Bankruptcy Sales and sale of Gospel Light's assets, subject to the terms and conditions set forth in this Agreement.

G.      The Parties have determined that this Agreement is in their respective best interests and that the consideration from Super G for this Agreement is fair and reasonably equivalent to the value of all consideration from Gospel Light, and are, therefore, willing to enter into this Agreement, and have entered into this Agreement, freely and voluntarily and without duress or coercion of any kind.

## AGREEMENT

**NOW THEREFORE**, in consideration of the foregoing and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Effect of This Agreement.**   Except for the covenants of the Parties hereunder, and except as expressly provided by this Agreement, the Note, Business Loan Agreement, Guaranty and all loan documents, written agreements, and guaranties between the Parties shall continue and shall remain in full force and effect in accordance with their respective terms.   Unless expressly modified, changed, or eliminated by this Agreement, all written agreements, including the Note and Business

Loan Agreement shall continue in full force and effect as written.  Gospel Light and the Guarantors hereby acknowledge, reaffirm, and agree that Gospel Light and Guarantors remain indebted to the Lender, as applicable, pursuant to the Note, Business Loan Agreement, Guaranty, loan documents, written agreements, and guaranties to which Gospel Light and any Guarantors are a party.  Except as modified in this Agreement, said Note, Business Loan Agreement, Guaranty and loan documents remain in full force and effect, are valid and binding obligations upon Gospel Light and the Guarantors, and are fully enforceable by the Lender, as applicable, against Gospel Light and the Guarantors, according to the terms thereof.

2.    **Guarantors' Acknowledgement and Consent.**  The Guarantors consent to the execution, delivery, and performance of this Agreement by Gospel Light and Super G.

3.    **Conditions Precedent to Effectiveness**.    The provisions of this Agreement shall become effective as follows:

A. Paragraph 4 of the Agreement shall become binding and effective immediately upon execution of the Agreement by all Parties.

B. All remaining provisions of the Agreement shall become binding and effective upon the entry of an order in the Bankruptcy Case approving the Agreement (the "Approval Order"), as set forth hereinafter.

4.    **Filing of the Bankruptcy Case and Forbearance Pending Filing**.

A. Gospel Light intends to initiate the Bankruptcy Case by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  If Gospel Light does initiate and commence the Bankruptcy Case or any case or proceeding under the United States Bankruptcy Code, Gospel Light shall not commence the Bankruptcy Case or any case or proceeding under the United States Bankruptcy Code earlier than August 5, 2015, or later than August 7, 2015.

B. So long as the Bankruptcy Case or any case or proceeding initiated by Gospel Light under the United States Bankruptcy Code is commenced on or between August 5, 2015 and August 7, 2015, Super G will, to and through December 31, 2015, forbear from pursuing any remedies available to it under the Note, Business Loan Agreement, Guaranty and/or applicable law.  Notwithstanding the foregoing, Super G may, in the Bankruptcy Case or any case or proceeding under the United States Bankruptcy Code, take any and all actions it deems necessary or appropriate to enforce its rights under this Agreement and obtain any remedies available.

C. In the event that (i) Gospel Light initiates and commences the Bankruptcy Case or any case or proceeding under the United States Bankruptcy Code either (a) prior to August 5, 2015, or (b) later than August 7, 2015, or (ii) this Agreement is not approved, on a final basis, by the Bankruptcy Court in the Bankruptcy Case or any proceeding commenced by Gospel Light under the United States Bankruptcy Code within 30 days following the commencement date of the Bankruptcy Case or any proceeding commenced by Gospel Light under the United States Bankruptcy Code, or (iii) this Agreement is avoided, rescinded, cancelled, terminated, or no longer effective, or (iv) is breached by Gospel Light, or (iv) the validity, or priority or extent of the Super G UCC-1 Financing Statement is challenged in any court or tribunal by any party, person or entity, provided (a) if Super G is required to respond in such court or tribunal in order to protect Super G's interests under the Super G UCC-1 Financing Statement, and (b) such court or tribunal determines that such challenging party has proper standing to prosecute such challenge against the Super G UCC-1 Financing Statement, or (v) the Payment, as such term is described below, in immediately available funds, is not delivered to Super G on or prior to December 31, 2015, this Agreement, in its entirety, including the releases contained herein, shall be null and void and be of no force or effect and the Parties shall return to the positions they each respectively held prior to the execution of this Agreement.

5. **Super G's Claims.** Gospel Light and Guarantors agree, warrant and represent, that Super G has, and shall have in the Bankruptcy Case:

A. An allowed secured claim in the sum of $655,000.00 (the "Secured Claim"). The Secured Claim is secured and collateralized by the Super G UCC 1 Financing Statement, which constitutes a valid, enforceable, perfected and unavoidable first priority security interest against the assets of Gospel Light set forth therein.

B. A general unsecured claim of $75,000 (the "Unsecured Claim").

6. **Payment.** Gospel Light shall pay Super G, no later than December 31. 2015, the sum of $650,000.00 (the "Payment") in immediately available funds on account of the Secured Claim and all obligations by and between the Parties, including the Agreement, Note, Business Loan Agreement and Guaranty. The Payment shall be made and paid from the following:

A. Gospel Light shall pay Super G all proceeds from the sale of the ZDL Membership, less the amount of the PRI Deposit (the "Net ZDL Proceeds"). The Net ZDL Proceeds shall be paid to Super G no later than 7 calendar days from the receipt and clearance of such funds in Gospel Light's bank account.

B. Gospel Light shall pay to Super G the proceeds of all Bankruptcy Sales, net of actual and customary reasonable costs of sale, excluding therefrom any and all attorney's fees and professional fees (the "Net Sale Proceeds").  Net Sale Proceeds shall be paid to Super G no later than 7 calendar days of the receipt and clearance of such funds in Gospel Light's bank account.

C. Gospel Light shall pay Super G all Net ZDL Proceeds and Net Sale Proceeds received by Gospel Light until the full Payment has been paid, provided that the Payment, i.e., $650,000, is made and delivered to Gospel Light no later than December 31, 2015.

The balance of $5,000 due and owing on the Secured Claim shall be paid, in full, to Super G through, and upon the "effective date" of, Gospel Light's confirmed plan, but in no event later than March 1, 2016.

7.     **Method of Payment.**  All money to be paid or required to be paid by this Agreement shall be in immediately available lawful money of the United States of America made by check or wire transfer from Gospel Light's general debtor-in-possession bank account to Super G.  All payments shall be either mailed to: Super G Funding, LLC, c/o Marc A. Cole, 23 Corporate Plaza, Suite 100, Newport Beach, California 92660, or wired to the following: Commerce Bank and Trust Company, 386 Main Street, Worcester, MA 01608, ABA # 011300142, Account Name: Super G Funding, LLC, Account # 7238120.

8.     **Release of Lien.**  Upon Super G's timely and indefeasible receipt of the sum of $655,000 in full satisfaction of the Secured Claim, as required by this Agreement, Super G shall file UCC Termination Statements (the "Termination Statements") in all jurisdictions in which Super G filed a UCC-1 Financing Statement in connection with the Note and/or Business Loan Agreement. The Termination Statements shall be filed within 7 calendar days of Super G's timely and indefeasible receipt of the sum of $655,000 as required by this Agreement.

9.     **Waiver of Late Fees, Default Interest, Attorneys Fees, and Other Provisions of the Note and Business Loan Agreement.**  Except as provided herein and upon Super G's timely and indefeasible receipt of the sum of $655,000 in full satisfaction of the Secured Claim, as required by this Agreement, Super G shall waive and release the following obligations under the Note, Business Loan Agreement, Guaranty and related loan documents:

A. All late fees on all prior missed payments under the Note and/or Business Loan Agreement;
B. All late fees that may come due under paragraph 2.6 of the Business Loan Agreement;
C. All accrued default interest on "Unpaid Obligations" under the Business Loan Agreement;

D. Any and all interest or late fees that may be owing under paragraphs 7.1a-o, and 8.1a-h of the Business Loan Agreement;

E. Any prepayment penalty under the Business Loan Agreement;

F. Any and all other "Obligations" (as defined in paragraph 2.7 of the Business Loan Agreement) owing by Gospel Light and/or the Guarantors under the Business Loan Agreement, but for the obligations owing under paragraph 4 of this Agreement;

G. Any and all other alleged "Events of Default", if any, (as defined in paragraph 7.1 of the Business Loan Agreement) by Gospel Light and/or the Guarantors under the Business Loan Agreement; and

H. Any attorneys' fees incurred by Super G that may be deemed owing by Gospel Light pursuant to paragraph 10.2 of the Business Loan Agreement or any other paragraph of the Business Loan Agreement.

The Parties agree that the amounts referenced above in this paragraph 9, including, but not limited to paragraphs 9.A through and including 9.H, that are agreed to be waived and released upon Super G's timely and indefeasible receipt of the sum of $655,000 in full satisfaction of the Secured Claim, as required by this Agreement, constitute disputed amounts, and represent a waiver of such amounts rather than a forgiveness of indebtedness.

  10. **Consent to Use of Cash Collateral**.

Super G consents to Gospel's Light's use of Super G's "cash collateral", as such term is defined by 11 U.S.C. § 363(a), in the Bankruptcy Case for a period of one hundred twenty (120) days from the commencement date of the Bankruptcy Case (the "Initial Cash Collateral Term") pursuant to 11 U.S.C. § 363(c)(2)(A) in strict accordance with the budget attached to this Agreement as **Exhibit "A"** (the "Budget"). Super G further agrees that it will not object to any motion filed by Gospel Light seeking use of cash collateral during the Initial Cash Collateral Term, provided that such Motion shall seek final approval of this Agreement and is consistent with the Budget and the terms of the Agreement. Use of cash collateral after the Initial Cash Collateral Term shall be subject to subsequent negotiations between Gospel Light and Super G. In addition to all other benefits set forth herein adequately protecting Super G's interests and liens, Super G, as further adequate protection, shall be granted replacement liens upon all post-petition assets of Gospel Light's bankruptcy estate created by the Bankruptcy Case, except any avoidance actions arising under Bankruptcy Code § § 544, 545, 546, 547, 548, 549, 550 or any similar provisions of the Bankruptcy Code, to the same extent, validity and priority of Super G's liens and security interests in Gospel Light's assets. Such replacement liens are deemed duly perfected and recorded under all applicable laws without the need for any notice or filings. Further, each Wednesday after the commencement of the Bankruptcy Case, Gospel Light shall deliver to Super G, or its counsel, a written report/comparison of Gospel Light's budget versus its actual performance.

11.  **Cooperation with the Bankruptcy Sales.** With respect to Gospel Light's efforts in the Bankruptcy Case to conduct the Bankruptcy Sales, and so long as Gospel Light is not in breach of this Agreement, Super G agrees to:

A.  Cooperate, at no cost to Super G, with the Bankruptcy Sales and not object to any motion to approve the Bankruptcy Sales provided such motions are consistent with the terms of the Agreement.

B.  Execute any documents necessary to facilitate the Bankruptcy Sales, provided such does not prejudice or impair the rights, security interests and liens of Super G.

12.  **Consent to Bankruptcy Sales.** Provided Gospel Light is in compliance with the terms of the Agreement, including timely payment of all Net ZDL Proceeds and Net Proceeds to Super G, Super G consents to the sale of all Gospel Light assets pursuant to the Bankruptcy Sales free and clear of the Super G's liens and security interests, including the Super G UCC-1 Financing Statement, pursuant to 11 U.S.C. § 363(f)(2), with Super G's liens, security interests, claims, interests and encumbrances attaching to such proceeds in the same validity, priority and enforceability of Super G's pre-Bankruptcy Case liens, security interests, claims, interests and encumbrances.

13.  **No Repayment of Subordinated Debt.** Gospel Light acknowledges that R.R. Donnelley & Sons Company ("RRD") has subordinated its debt, security interests, liens, claims, and encumbrances to the debt, security interests, liens, claims, and encumbrances of Super G. As long as any amounts remain due and owing to Super G under this Agreement, Gospel Light and the Guarantors shall not make any payments or transfers of any kind to anyone on account of the indebtedness owing to RRD. Notwithstanding, Gospel Light may make payments to RRD for fulfillment services, printing, and timely payments for only current purchases of inventory.

14.  **Support for Plan.** Provided that Gospel Light is not in breach of this Agreement, Super G agrees to take no act in opposition to, or inconsistent with, confirmation of the Liquidating Plan to be proposed by Gospel Light, and that Super G will, if entitled to vote on such plan, vote in favor of the Liquidating Plan, so long as such Liquidating Plan is consistent with the terms of the Agreement and does not prejudice or impair the rights, security interests and liens of Super G. The Parties agree that this provision does not constitute a solicitation of acceptance or rejection of any Chapter 11 Plan of Reorganization to be proposed by Gospel Light.

15.  **Approval by the Bankruptcy Court**. Immediately following the commencement date of the Bankruptcy Case, or as soon thereafter as practical, but in no event more than three days after the commencement date of the Bankruptcy Case, Gospel Light shall file a motion, on an emergency *ex parte* basis, in the Bankruptcy Case, seeking (a) the approval of Gospel Light's use of Super G's cash collateral in accordance with the Budget and (b) the final approval of this Agreement (the "Approval Order"). The Approval Order must be entered by the Bankruptcy Court in the

Bankruptcy Case no later than 30 days following the commencement date of the Bankruptcy Case.

16.    **Waiver by Gospel Light Re Surcharge and Priming/*Pari Passu* Loans**. Gospel Light, in its capacity as a debtor or debtor in possession, and the bankruptcy estate of Gospel Light created by the Bankruptcy Case, hereby irrevocably waives, and agrees to be barred from asserting or exercising any right under (a) Bankruptcy Code § 506(c) with respect to Super G and Super G's security interests and collateral and (b) Bankruptcy Code § 364 or otherwise to grant or impose liens or security interest on any of Gospel Light's assets which are *pari passu* with or senior to Super G's liens and security interests.

17.    **Release of Guaranties.**  Upon Super G's timely and indefeasible receipt of the sum of $655,000 in full satisfaction of the Secured Claim, as required by this Agreement, all prior guaranties by the Guarantors in favor of Super G, including the Guaranty, shall be released in full, cancelled and be of no further force or effect.

18.    **Release of Claims**.

   A.  Subject to the provisions of paragraph 4.C of this Agreement, and except for the rights, duties and obligations created by this Agreement, the Gospel Light Parties, for themselves, as well as for all persons and entities who could claim through or under them, hereby release and forever discharge the Lender and its parent, subsidiaries, affiliates, successors, assigns, officers, directors, members, managers, employees, agents, accountants, auditors, insurers, investigators, attorneys, and representatives (the "Lender Released Parties") from any and all debts, claims, demands, liabilities, obligations, causes of action, and rights (whether direct, indirect, derivative, or by way of indemnity, contribution or subrogation, or of any other nature), whether known or unknown, suspected or unsuspected, whether at law or in equity, anticipated or unanticipated, fixed or contingent, and whether based on tort or breach of a contractual or other duty, from the beginning of the world to and through the date of this Agreement, including, but not limited to any claims that the Gospel Light Parties ever had, now have, or may, shall, or can hereafter have against the Lender Released Parties, relating or appertaining to, arising out of, or deriving from any of the matters, events, and circumstances described in the Recitals, with the exception of any and all rights, duties and obligations created under this Agreement.

   B.  Subject to the provisions of paragraph 4.C of this Agreement, and except for the rights, duties and obligations created by this Agreement, and further subject to and conditioned upon Lender's indefeasible receipt of the sum of $655,000 in full satisfaction of the Secured Claim, as required by this Agreement, the Lender, for itself, as well as for all persons and entities who could claim through or under it, hereby releases and forever

8

**EXHIBIT 1**                                    **Page 27 of 37**

discharges Gospel Light and their parents, subsidiaries, affiliates, successors, assigns, officers, directors, employees, agents, accountants, auditors, insurers, investigators, attorneys, and representatives, but excepting Guarantors, (the "Gospel Light Released Parties") from any and all debts, claims, demands, liabilities, obligations, causes of action, and rights (whether direct, indirect, derivative, or by way of indemnity, contribution or subrogation, or of any other nature), whether known or unknown, suspected or unsuspected, whether at law or in equity, anticipated or unanticipated, fixed or contingent, and whether based on tort or breach of a contractual or other duty, from the beginning of the world to and through the date of this Agreement, including, but not limited to any claims that Super G ever had, now has, or may, shall, or can hereafter have against the Gospel Light Released Parties, relating or appertaining to, arising out of, or deriving from any of the matters, events, and circumstances described in the Recitals, with the exception of any and all obligations created under this Agreement.

19. **Unknown Claims; Waiver of Rights Under California Civil Code Section 1542.** Except for the obligations created by this Agreement, each of the releases contained in Paragraph 18 of this Agreement extends to all claims encompassed within each such respective release, whether such claims are known or unknown. Each of the Parties hereby acknowledges that they are familiar with California Civil Code Section 1542, which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each Party hereby waives application of California Civil Code Section 1542 as to its respective release. In doing so, each Party acknowledges that this means that if it should suffer any additional injuries, damages, or losses out of the matters described in its respective release, but of which it is not currently aware and which, if known, would materially affect its decision to execute its respective release, it would not be able to make any claim for those injuries, damages or losses.

20. **Finality of Releases.** In entering into this Agreement and the releases provided for herein, the Parties, and each of them, recognize that no facts or representations are ever absolutely certain; accordingly, the Parties, and each of them, assume the risk of any misrepresentation, concealment, or mistake. The Parties, and each of them, agree and acknowledge that should they subsequently discover that any fact relied upon in entering into this Agreement was untrue, or that any fact was

concealed from him or it, or that any understanding of the law was incorrect, the Parties shall not be entitled to set aside this Agreement, including, but not limited to, the releases contained herein, by reason thereof, regardless of any claims of fraud, misrepresentation, promise made without the intention of performing it, concealment of fact, mistake of fact, or law, or any other circumstances whatsoever.

21.    **Revival**.  Notwithstanding any other provision of this Agreement, if the payment of any money, the granting of any security interest, the transfer of property (including any transfer in whole or partial satisfaction of indebtedness), or any of the obligations of any of Gospel Light and the Guarantors pursuant to this Agreement, or the exercise by Super G of any rights or remedies under this Agreement or otherwise, should for any reason subsequently be alleged or found to be "fraudulent" or otherwise avoidable within the meaning of any state or federal law relating to fraudulent transfers or conveyances, or are alleged or found to be preferential or otherwise avoidable or recoverable, in whole or in part or for any reason, under the U.S. Bankruptcy Code or any other federal or state law (individually and collectively herein referred to as a "Voidable Transfer"), and Super G is required to pay or restore the amount of any such Voidable Transfer, or any portion thereof, then, and in any such case, the liability and indebtedness of Gospel Light and Guarantors, and all of them, to Super G (including, without limitation, all costs, expenses, and attorneys' fees of Super G related thereto, which may be incurred in connection with any action or response of Super G, including, but not limited to, any action for relief from stay or similar proceedings, and including any repayment by way of settlement of any claim of Voidable Transfer), and Super G's rights and security interests in all such collateral, shall automatically be revived, reinstated, and restored in such amount or amounts, and shall continue to exist as though such Voidable Transfer had not been made.  Nothing set forth herein is or shall constitute an admission that any such Voidable Transfer has occurred or may hereafter occur.  Gospel Light and Guarantors expressly acknowledge that Super G may rely upon advice of counsel in taking any action or otherwise responding to any such alleged Voidable Transfer, and if so advised by counsel, may settle, without defending, any action to avoid any alleged Voidable Transfer, and that upon such settlement Gospel Light and Guarantors shall again be liable for any deficiency resulting from such settlement as provided in this Agreement, and all security therefor shall be automatically revived and reinstated in the same lien priority as existed immediately prior to such alleged Voidable Transfer.  Notwithstanding any provision to the contrary contained in this Agreement, including, without limitation, any provision for the dismissal (with or without prejudice) of any litigation with respect to Gospel Light's or Guarantors' obligations, liability, or indebtedness to Super G, said obligation, liability, and indebtedness of Gospel Light and Guarantors revived pursuant to this paragraph shall be deemed to be new obligations of Gospel Light and Guarantors to Super G, arising as of the date of revival hereunder, and shall be deemed to be created for and supported by good and valuable consideration then existing, and Super G shall be entitled to commence and prosecute any and all actions or proceedings to enforce and collect upon said obligations which Super G would otherwise be entitled to commence and prosecute without regard to the filing of any such dismissal and without regard to the running of any applicable statute of limitation relating to Gospel Light's or Guarantors'

original obligations to Super G under the Note, Business Loan Agreement, Guaranty and related loan documents.

22.    **No Prior Assignment of Released Claims**.  Except as acknowledged or described in this Agreement, the Parties have not heretofore assigned, transferred, or granted or purported to assign, transfer, or grant any of the claims, demands, liens, debts, obligations, agreements, expenses, disputes, and cause or causes of action released pursuant to this Agreement.  The Parties represent that they are the owners of the claims, demands, damages, debts, disputes, liabilities, accounts, obligations, costs, expenses, actions, liens, agreements, and cause or causes of action that each of the Parties are releasing and the Parties shall indemnify, defend, and hold each other Party for whose benefit such releases are made free and harmless from and against any claims, demands, damages, debts, disputes, liabilities, accounts, obligations, costs, expenses, actions, liens, agreements, and cause or causes of action made or asserted by any other person, firm, or entity purporting to be the owner of any claims, demands, damages, debts, disputes, liabilities, accounts, obligations, costs, expenses, actions, persons, agreements, and cause or causes of action so released.

23.    **No Further Commitments to Lend or Extend the Time for Repayment**.  Gospel Light agrees and acknowledges that the Lender has no obligation to advance, provide, or loan any further or additional monies or credit to Gospel Light. Gospel Light and all Parties further agree and acknowledge that the Lender will not, and has no obligation to, further extend the time for payment of any obligations owing to or arising in favor of the Lender by Gospel Light, except as expressly provided for in this Agreement or the Note or Business Loan Agreement.

24.    **Representations and Warranties by the Gospel Light Parties to Super G.**  The Gospel Light Parties hereby make the following representations and warranties to Super G:

A.    The Gospel Light Parties have the power and authority to enter into this Agreement and no consent of any person is required in order to enter into and perform their obligations under this Agreement, other than the requirement of Gospel Light obtaining the Approval Order.

B.    To the best of the Gospel Light Parties' knowledge, there is no action, suit, claim, proceeding, or investigation pending or threatened against any of the Gospel Light Parties that might impair the consummation or performance of this Agreement.

C.    The execution and delivery by the Gospel Light Parties of this Agreement to Super G will not, with or without the giving of notice or passage of time, or both: (a) conflict with or violate any law, statute, rule, regulation, or administrative order to which it is subject or by which its assets are bound or affected; (b) violate any judgment, order, writ, or decree of any court or administrative body in any suit or proceeding to which it is a party; or (c) result in a breach of or default under any material

agreement, commitment, contract (written or oral), or other material instrument, to which it is a party or by which any of its assets are bound or affected.

25.    **Representations and Warranties by Super G to the Gospel Light Parties.**  Super G hereby makes the following representations and warranties to the Gospel Light Parties:

A.    Super G has the power and authority to enter into this Agreement and no consent of any person is required in order to enter into and perform their obligations under this Agreement, other than the requirement of Gospel Light obtaining the Approval Order.

B.    To the best of Super G's knowledge, there is no action, suit, claim, proceeding, or investigation, pending or threatened against Super G that might impair the consummation or performance of this Agreement.

C.    The execution and delivery by Super G of this Agreement will not, with or without the giving of notice or passage of time, or both: (a) conflict with or violate any law, statute, rule, regulation, or administrative order to which it is subject or by which its assets are bound or affected; (b) violate any judgment, order, writ, or decree of any court or administrative body in any suit or proceeding to which it is a party; or (c) result in a breach of or default under any material agreement, commitment, contract (written or oral), or other material instrument, to which it is a party or by which any of its assets are bound or affected.

26.    **Governing Law, Forum Selection, and Consent to Jurisdiction.**  This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of California. For purposes of venue and jurisdiction, this Agreement shall be deemed made and to be performed in Los Angeles, California.  The United States Bankruptcy Court for the Central District of California, Northern Division, shall have retaining, concurrent jurisdiction to hear any disputes under this Agreement.  In the event that the United States Bankruptcy Court for the Central District of California, Northern Division fails to exercise jurisdiction to hear any such disputes, the Parties agree that such disputes shall by heard by the Superior Court of California for the counties of either Los Angeles or Ventura.  Further, as a matter of clarification, if this Agreement is not approved, in full and in all respects, by the Bankruptcy Court in the Bankruptcy Case as required by this Agreement, the Note, Business Loan Agreement and the Guaranty shall control with respect to the matters set forth in this paragraph.

27.    **Rules of Construction.**    All Parties, including their counsel, have participated in the preparation of this Agreement, and this Agreement is the result of the joint efforts of all of the Parties.  This Agreement has been accepted and approved as to its final form by all Parties and upon the advice of their respective counsel.  Accordingly, any uncertainty or ambiguity existing in this Agreement shall not be interpreted against any Party as a result of the manner of the preparation of this Agreement. Each Party to this Agreement agrees that any statute or rule of construction providing that ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation

of this Agreement and are hereby waived.

28.     **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors in interest, assigns, heirs, and personal representatives.

29.     **No Waiver.**  No failure or delay on the part of any Party in the exercise of any right, power, or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any such right, power, or privilege shall preclude a further exercise thereof or of any other right, power or privilege.

30.     **Time Is of the Essence.**  The Parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

31.     **Counterparts.**  This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered (including by email or facsimile transmission), shall be original, and all of which together shall constitute one and the same agreement.  Counterparts of this Agreement may be delivered by facsimile transmission or email transmission, and each Party delivering this Agreement by such means shall promptly deliver original signed counterparts hereof to the other Parties, provided that any failure by such Party to deliver original counterparts shall not affect the validity, or the delivery, of this Agreement.

32.     **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all other agreements, oral or written, between the Parties with respect to the subject matter.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except upon the basis of a written instrument executed by or on behalf of such Party, which written instrument must expressly reference this Agreement.  Each of the Parties acknowledge and represent that they have read this Agreement carefully and that there have been no oral or written statements made to them by any other Party that contradicts, varies, or would change the meaning of any statements, promises, or agreements set forth in this Agreement.

33.     **Advice of Counsel**.  The Parties, and each of them, warrant and represent that, in executing this Agreement, they have relied upon legal advice from the attorney of such Party's own choice and that the terms of this Agreement have been read and its consequences (including risks, complications and costs) have been completely explained to such Party by its attorney; and that each such Party fully understands the terms of this Agreement.  Each Party further acknowledges and represents that, in executing this Agreement and the releases contained herein, it has not relied on any inducements, promises or representations made by any other Party or any agent representing or serving the other party.

34.    **Voluntary Agreement**.  The Parties, and each of them, acknowledge, represent and warrant that the execution of this Agreement, and the agreement to the provisions, terms and conditions of this Agreement, is free and voluntary.

35.    **Modification of Agreement**.  This Agreement may not be modified by any Party by any oral representation made before or after the execution of this Agreement.  All modifications to this Agreement must be in writing and signed by Gospel Light, Guarantors, and each of them, and Super G.

36.    **Attorney's Fees and Costs**.  If any action or proceeding is brought for the enforcement of, interpretation of, or with respect to this Agreement, or in connection with any dispute arising out of it or the claims that are the subject of the releases contained in this Agreement, the prevailing party shall be entitled to recover its actual attorney's fees and other costs incurred in such action or proceeding in addition to any other relief to which the prevailing party may be entitled.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date as set forth on the first page of this Agreement.

Gospel Light Publications

By: _David Thornton_
David Thornton, Chief Executive Officer

"Guarantors"

_Doris Jane Greig_
Doris Jane Greig, an individual

_Gary Stanley Greig_   4 August 2015
Gary Stanley Greig, an individual

Super G Funding, LLC

By:_____
Darrin Ginsberg, Chief Executive Officer

14

**EXHIBIT 1**                              **Page 33 of 37**

34.    **Voluntary Agreement**.  The Parties, and each of them, acknowledge, represent and warrant that the execution of this Agreement, and the agreement to the provisions, terms and conditions of this Agreement, is free and voluntary.

35.    **Modification of Agreement**.  This Agreement may not be modified by any Party by any oral representation made before or after the execution of this Agreement.  All modifications to this Agreement must be in writing and signed by Gospel Light, Guarantors, and each of them, and Super G.

36.    **Attorney's Fees and Costs**.  If any action or proceeding is brought for the enforcement of, interpretation of, or with respect to this Agreement, or in connection with any dispute arising out of it or the claims that are the subject of the releases contained in this Agreement, the prevailing party shall be entitled to recover its actual attorney's fees and other costs incurred in such action or proceeding in addition to any other relief to which the prevailing party may be entitled.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date as set forth on the first page of this Agreement.

Gospel Light Publications

By:_____
    David Thornton, Chief Executive Officer

"Guarantors"

_____
Doris Jane Greig, an individual

_____
Gary Stanley Greig, an individual

Super G Funding, LLC

By:_____
    Darrin Ginsberg, Chief Executive Officer

**EXHIBIT 1**                    **Page 34 of 37**

# EXHIBIT A

**EXHIBIT 1**                    **Page 35 of 37**

**CASH FLOW PROJECTION SUMMARY**

Week Ending: 8/8/2015

| | | | 8-Aug | 15-Aug | 22-Aug | 29-Aug | 5-Sep | 12-Sep | 19-Sep | 26-Sep |
|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | | Pete | 175,000 | 175,000 | 215,971 | 235,514 | 212,025 | 151,840 | 177,296 | 144,506 |
| **Customer Payments:** | | | | | | | | | | |
| A/R Payments projected (invoiced) | AR DETAIL sheet | Pete | | 27,304 | 24,385 | 19,337 | 12,884 | 13,055 | 9,655 | 11,882 |
| A/R Payments (revenue forecast) | 2014 invoice $$ & terms | Pete | | 75,000 | 10,000 | 44,000 | 117,397 | 13,000 | 31,929 | 64,406 |
| PRI wire for ZDL redemption agreement | projected | | | - | - | - | - | - | - | 75,000 |
| **Payroll Related:** | | | | | | | | | | |
| Payroll & Taxes Salary | | Liane | - | 38,000 | - | - | - | - | 38,000 | - |
| Payroll & Taxes Hourly | | Liane | - | 7,000 | - | - | - | - | 7,000 | - |
| Payroll/Direct Comissions | Commissions sheet | Liane | - | - | - | - | - | - | - | - |
| **Purchase Orders:** | | | | | | | | | | |
| Projected Reprint Purchase Orders | Beth Average/Estimation | Beth | - | - | 12,000 | - | 175,000 | - | - | - |
| **Accounts Payable:** | | | | | | | | | | |
| AP Invoices from AS400 | AP DETAIL sheet | Liane | | 1,959 | | 1,964 | | - | - | - |
| **Recurring Expenses/Payments:** | | | | | | | | | | |
| RR Donnelley Fulfillment/Freight | Warehousing, distrl, & Freight | Liane | - | - | - | 54,000 | - | - | - | 78,500 |
| Dell Leases | | Liane | - | 1,092 | - | - | - | - | 1,092 | - |
| Dell Credit Line | | Liane | - | 3,000 | - | - | - | - | 3,000 | - |
| Time Warner | Data | Liane | - | 2,825 | - | - | - | - | 2,825 | - |
| Time Warner | Phone | Liane | - | 1,182 | - | - | - | - | 1,182 | - |
| 8x8/VOIP Phone solution | Phones/new | Liane | - | 1,425 | - | - | - | - | 1,425 | - |
| Pitney Bowes | Postage | Liane | - | 4,000 | - | - | - | - | 4,000 | - |
| Pitney Bowes | Meter rental | Liane | - | 250 | - | - | - | - | 250 | - |
| UPS | Ventura postage, return labels | Liane | | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Fedex | Ventura postage | Liane | | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Rent/Utilities for 1923 Eastman | 1st month /last month in December | Liane | - | - | - | - | 7,866 | - | - | - |
| Xerox Financial Services | Copier lease | Liane | - | - | 2,242 | - | - | - | - | 2,242 |
| Abridge/Bill Schultz | See Commissions sheet (less 10% VBS) | Liane | - | - | - | - | - | - | 15,000 | - |
| Legal Fees | | Dave | - | - | - | 7,500 | - | - | - | 7,500 |
| Finance Consultant | Don Fife | Liane | | - | - | - | 2,000 | - | - | - |
| Sales Tax | Estimated Sales and Use Tax | Liane | | - | - | - | 5,000 | - | - | - |
| **Insurances:** | | | | | | | | | | |
| Insurance/Chubb | Machinery breakdown, liability | Liane | - | - | - | 7,500 | - | - | - | 7,500 |
| First Insurance | Liability/Dir, officers, theft | Liane | - | - | - | 4,047 | - | - | - | 4,047 |
| Travelers Insurance | Commercial, Ocean Express Cargo | Liane | - | - | - | 1,206 | - | - | - | 1,206 |
| **Maintenance Contracts:** | | | | | | | | | | |
| IBM Credit LLC (Non-Prod PO sheet) | AS400 Maintenance Contract | Liane | - | - | - | 2,445 | - | - | - | 2,445 |
| Pulse One | IT Service Agreement | Liane | - | - | - | 4,000 | - | - | - | 4,000 |
| Bit-Wizards | Web hosting | Liane | - | - | - | 1,600 | - | - | - | 1,600 |
| **Incidental/Non-Recurring:** | | | | | | | | | | |
| 2014-2015 Property Tax | | | | | | | 1,964 | | | |
| Super G Note Repayment | | | | | | | | | | |
| **Total Projected Expenses** | | | - | 61,333 | 14,842 | 86,826 | 190,466 | 600 | 74,374 | 109,640 |
| **Calculated Ending Cash** | | | 175,000 | 215,971 | 235,514 | 212,025 | 151,840 | 177,296 | 144,506 | 186,154 |

**EXHIBIT 1**

| 3-Oct | 10-Oct | 17-Oct | 24-Oct | 31-Oct | 7-Nov | 14-Nov | 21-Nov | 28-Nov |
|---|---|---|---|---|---|---|---|---|
| **186,154** | **155,878** | **168,484** | **128,374** | **162,384** | **83,090** | **101,833** | **129,073** | **197,250** |
| 90,000 | 3,206 | 2,263 | 3,744 | 4,562 | - | - | 793 | 12 |
| 10,611 | 10,000 | 15,000 | 33,108 | 28,159 | 31,709 | 76,340 | 84,000 | 57,482 |
| - | | | | | | | | |
| 38,000 | - | 35,000 | - | 35,000 | - | 32,500 | - | 32,500 |
| 7,000 | - | 5,000 | - | 5,000 | - | 2,500 | - | 2,500 |
| - | - | 2,000 | - | - | - | 6,500 | - | - |
| - | - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - | - |
| - | - | - | - | 38,617 | - | - | - | 63,000 |
| - | - | 1,092 | - | - | - | - | 1,092 | - |
| - | - | 3,000 | - | - | - | - | 3,000 | - |
| - | - | 2,825 | - | - | - | - | 2,825 | - |
| - | - | 1,182 | - | - | - | - | 1,182 | - |
| - | - | 1,425 | - | - | - | - | 1,425 | - |
| - | - | 4,000 | - | - | - | - | 4,000 | - |
| - | - | 250 | - | - | - | - | 250 | - |
| 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| 7,866 | - | - | - | - | 7,866 | - | - | - |
| - | - | - | 2,242 | - | - | - | 2,242 | - |
| - | - | 1,000 | | - | - | 7,000 | | |
| - | | | | 7,500 | | | | 7,500 |
| 2,000 | - | - | - | - | 4,500 | - | - | |
| 420 | - | - | - | 4,500 | - | - | - | |
| - | - | - | - | 7,500 | | | | |
| - | - | - | - | 4,047 | | | | |
| - | - | - | - | 1,206 | | | | |
| - | - | - | - | 2,445 | - | - | - | |
| - | - | - | - | 4,000 | - | - | - | - |
| - | - | - | - | 1,600 | - | - | - | - |
| 75,000 | | | | | | | | |
| 130,886 | 600 | 57,374 | 2,842 | 112,015 | 12,966 | 49,100 | 16,616 | 106,100 |
| *155,878* | *168,484* | *128,374* | *162,384* | *83,090* | *101,833* | *129,073* | *197,250* | *148,644* |

**EXHIBIT 1**