CRAIG MARGULIES (SBN 185925)
JEREMY W. FAITH (SBN 190647)
NINA Z. JAVAN (SBN 271392)
**MARGULIES FAITH, LLP**
16030 Ventura Blvd., Suite 470
Encino California 91436
Telephone: (818) 705-2777
Facsimile: (818) 705-3777
Email: Craig@MarguliesFaithLaw.com

[Proposed] Attorneys for Gospel Light Publications
Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**NORTHERN DIVISION**

| | |
|---|---|
| In re | Chapter: 9:15-bk-11586-PC |
| | Case No.: 11 |
| GOSPEL LIGHT PUBLICATIONS, | **DECLARATION OF DAVE THORNTON, CHIEF EXECUTIVE OFFICER, IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** |
| Debtor and Debtor in Possession. | |
| | [Declaration of Dave Thornton, Chief Executive Officer, in Support of Emergency First Day Motions Filed Concurrently Herewith] |
| | Hearings to be Set by Court |

I, Dave Thornton, hereby declare as follows:

1.     I am the Chief Executive Officer of Gospel Light Publications, the debtor and debtor in possession (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case"). I joined the Debtor in May 2013 as Director of Church Sales and was promoted to Director of Sales and Marketing in March 2014. Shortly thereafter, in August 2014, I was again promoted to my current position, in which capacity I continue to serve. I have over twenty (20) years experience in the publishing field, and have served in a number

1

of managerial positions prior to my time at the Debtor. I have a B.A. in Speech Communications from Bethel University in St. Paul, Minnesota, and a Masters of Divinity in Christian Education from Trinity International University in Deerfield, Illinois.

2. I make this declaration in support of the following pleadings (collectively, the "First Day Motions", and each individually, a "First Day Motion"):

　　a. Emergency Motion Of Debtor And Debtor In Possession For An Order: (1) Authorizing Use Of Cash Collateral On An Interim Basis Pending A Final Hearing Thereon; And (2) Approving Cash Collateral Agreement (the "Cash Collateral Motion");

　　b. Debtor's And Debtor In Possession's Emergency Motion For An Order Limiting Scope Of Notice (the "Motion to Limit Notice");

　　c. Debtor's And Debtor In Possession's Emergency Motion For Order Authorizing The Rejection Of Executory Contract Pursuant To 11 U.S.C. § 365 (the "Rejection Motion");

　　d. Debtor's And Debtor In Possession's Emergency Motion For Order: (A) Deeming Utilities Adequately Assured Of Future Performance; And (B) Establishing Procedure For Determining Adequate Assurances Pursuant To 11 U.S.C. § 366 (the "Utilities Motion");

　　e. Debtor And Debtor In Possession's Emergency Motion For Order Authorizing Debtor To Pay Pre-Petition: (A) Wages, Salaries, And Other Compensation; (B) Employee Medical, Workers' Compensation And Similar Benefits; (C) Employee Deductions, (D) Reimbursable Employee Expenses; And (E) Authorizing And Directing Applicable Banks And Other Financial Institutions To Receive, Process, Honor, And Pay Checks Presented For Payment And To Honor Funds Transfer Requests Relating To The Foregoing (the "Pre-Petition Wages Motion"); and

　　f. Debtor's And Debtor In Possession's Emergency Motion For Order: (1)

Approving Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests; (2) Approving Bid Procedures For The Sale And Auction Of Assets; And (3) Scheduling An Auction And Hearing To Consider The Sale And Approve The Form And Notices Related Thereto (the "Motion to Sell").

3. In my capacity as Chief Executive Officer of the Debtor, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. Accordingly, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

4. The Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on August 7, 2015 (the "Petition Date"). The Debtor continues to carry out its business operations and manage its financial affairs as a debtor in possession. No trustee, examiner, or committee has been appointed in the Bankruptcy Case.

**The Debtor and its Business Operations**

5. Founded in 1933, the Debtor is a mid-market Christian media company specializing in the production of print and digital media educational resources to meet the needs of church leaders throughout the world. The Debtor is particularly well-known for its high-quality Vacation Bible School and Sunday School curriculum materials. The Debtor serves approximately 14,000 customers per year, through a combination of direct sales (via website and phone orders) and distributors. A large portion of these customers are churches and schools.

6. The Debtor operates out of leased offices located at 1923 Eastman Avenue, Ventura, California 93003 (the "Office") which it has occupied since February, 2015. As of the Petition Date, the Debtor has trimmed its head count to 14 employees, some of whom have been with the Debtor since the 1980s. The Debtor's employees handle the Debtor's customer service, sales, marketing, and operations functions.

7. The Debtor's fulfillment and warehousing needs are met offsite by a third party, R.R. Donnelly & Sons ("RRD"). RRD provides warehousing, assembly and distribution services to the Debtor from a facility in Appleton, Wisconsin (the "Warehouse"). RRD also provides offsite printing services to the Debtor.

8. The Debtor's most significant assets are its Sunday School Curriculum (the "Sunday School Asset") [1], its Vacation Bible School Curriculum (the "Vacation Bible School Asset")[2], and its Ministry Resource Line (the "Ministry Asset").

9. The Sunday School Asset operates on a subscription model, with customers dependent on receiving new materials every three (3) months. The materials for the next shipment of the Sunday School Asset arrived in the Warehouse at the end of July 2015, with shipment of the assembled materials to customers estimated to be completed by the end of August 2015. Although it does not operate under the same model as the Sunday School Asset, customers of the Ministry Asset are also dependent upon continuous services and the availability of resources provided by the Debtor.

**Events Leading to Bankruptcy**

10. A number of unanticipated occurrences during the last nine months, combined with a long term slowdown in the Christian publishing market, led to the Debtor's need for Chapter 11 relief.

11. Prior to December of 2014, Crestmark Bank ("Crestmark") provided the Debtor with working capital ranging from $1,000,000.00 to $3,000,000.00 annually. In or around early November 2014, Crestmark notified the Debtor that it did not believe the Debtor would be able to satisfy certain loan covenants, which included retaining a $1,000,000.00 cash balance at all times, and provided the Debtor with notice that Crestmark would no longer provide working capital effective January 2015. At that time,

---

[1] The Sunday School Asset had 4,220 direct customers in 2014 and generated total net revenue of $3,664,125.
[2] The Vacation Bible School Asset, which has impacted the lives of more than sixty-five million children since 1952, had 4,427 direct customers in 2014 and generated $2,055,396.00 in total net revenue.

the Debtor needed to find an alternate source of working capital to pay fulfillment invoices related to its Vacation Bible School line which were coming due in January 2015.

12. In December of 2014, the Debtor and Super G Funding, LLC ("Super G") entered into a short-term financing agreement whereby Super G provided the Debtor with a business loan in the amount of $1,200,000.00 (the "Super G Loan"). The Super G Loan allowed the Debtor to finalize the January 2015 production of the Vacation Bible School publication.

13. Shortly after entering into the Super G Loan, one of the Debtor's largest customers, Family Christian Stores, filed a Chapter 11 bankruptcy petition on February 11, 2015.[3] As a result of the Family Christian Stores' bankruptcy, the Debtor did not receive approximately $143,000.00 in expected income, which it was forced to write off.

14. In addition to the loss of the Family Christian Stores revenue, an issue with the Debtor's web developer also came to a head in February of 2015. In October of 2014, the Debtor retained Bit-Wizards Information Technology Solutions, Inc. ("Bit-Wizards") to design a new, responsive website for the Debtor using a different software platform.

15. Bit-Wizards originally estimated a project cost of approximately $160,000.00 and a projected "Go-Live" date for the new site of January 1, 2015. However, the new site was not deployed until February 14, 2015, by which time Bit-Wizards had billed almost $300,000.00, which was significantly over budget and more than the Debtor had anticipated. Further, the site continued to experience difficulties after deployment which, combined with the delayed launch, resulted in an estimated loss of $120,000.00 of anticipated revenue during the period from January 2015 to June 2015.[4]

16. Finally, in late April 2015, Insperity, the Debtor's employment services provider, changed the terms of the agreement with the Debtor by requiring the Debtor to

---

[3] This case is pending before the United States Bankruptcy Court for the Western District of Michigan (Grand Rapids) as In re Family Christian, LLC, Case Number 15-00643-jtg (jointly administered with In re Family Christian Holding, LLC, Case Number 15-00642 and In re FCS Giftco, LLC, Case Number 12-00644)

[4] Sales through the website are particularly important to the Debtor's cash flow since they are largely credit card sales, which result in immediate payment of the amounts due, rather than payment on credit terms (*e.g.,* 30-day invoicing).

begin pre-paying for payroll. This unanticipated modification to the agreement with Insperity further harmed the Debtor's cash flow by necessitating an immediate payment of $85,000.

17. The combination of the foregoing events dropped the Debtor's cash balance in April 2015 to the point that it had to default on its payments under the Super G Loan. The Debtor was also unable to make certain payments under its long term obligation to its warehouse and fulfillment company, RRD. With the slowdown in the market for Christian publishing, the Debtor's management did not foresee a means of continuing to operate under its current business model. Thus, by late April 2015, the Debtor's management began actively exploring a liquidation strategy in order to maximize the value of its assets for the benefit of creditors.

**Pre-Petition Liquidation Efforts and the Proposed ZDL Sale**

18. The Debtor's management has been actively involved in efforts to liquidate its various assets over the last 8 months. In December 2014, the Debtor's board of directors authorized me to explore the sale of the Debtor's membership interest in ZDL Holdings, LLC, a North Carolina Corporation ("ZDL"). ZDL does business in China publishing Christian literature and providing consulting services. The Debtor owns a sixty-three percent (63%) membership interest in ZDL (the "ZDL Asset"). I am informed and believe that Super G is the only entity asserting a security interest in the ZDL Asset.

19. I approached multiple Christian publishers[5] that expressed an interest in exploring this business opportunity. Although a pre-petition sale of the ZDL Asset could not be finalized, the Debtor was able to enter into an agreement (the "ZDL APA") to sell the ZDL Asset to ZDL's thirty-seven percent (37%) co-owner, Pacific Resources International, LLC ("PRI"). The ZDL APA is attached to the Motion to Sell as **Exhibit "B"**.

20. Pursuant to the ZDL APA, which contemplates the instant Bankruptcy Case, PRI will purchase the ZDL Asset for a total purchase price of $175,000.00 (the "ZDL

---

[5] Due to Non-Disclosure Agreements signed by the various parties, the specific companies approached and/or whom seriously explored the possibility of purchase of the ZDL Asset are not identified by name here.

Purchase Price"). Of the ZDL Purchase Price, $100,000.00 has already been paid to the Debtor as a good faith payment, and the remaining $75,000.00 is to be paid at closing.

21. The Debtor is seeking court approval of the ZDL APA, the benefit of which I believe greatly exceeds any liquidation which would lump the ZDL Asset into a larger parcel of assets to be sold. I believe the proposed sale of the ZDL Asset under the ZDL APA is supported by sound business reasons and is in the best interest of the Debtor and its estate.

22. After the impact of the Family Christian Stores bankruptcy case, and once the difficulty in obtaining future working capital became apparent, in March 2015, the Debtor's board of directors me to pursue additional asset sales.

23. From March through July of 2015, I marketed the Debtor's assets by approaching all of the large Christian publishing companies to explore their interest in a purchase of some or all of the remaining assets.

24. Beginning in April 2015, the Debtor's management engaged in serious talks with a potential purchaser for the sale of substantially all the Debtor's remaining assets. Although the Debtor ultimately received an offer from the potential purchaser in June 2015, it was determined both that the purchaser would not be able to complete its due diligence within a reasonable timeline, and that a sale of the Debtor's assets in smaller parcels would result in a greater return.

25. Since mid-June 2015, the Debtor has solicited interest from other parties under an asset segregation strategy. While none of these parties agreed to sign an asset purchase agreement prior to the instant bankruptcy filing, I believe that most would be active bidders in an auction in the Bankruptcy Case.

**The Debtor's Future Plans**

26. Through this Bankruptcy Case, the Debtor intends to operate its business to maintain the value of its assets while pursuing the sale of substantially all its assets. The value of the Debtor's assets depends on the Debtor remaining a going concern through

the Debtor's various sale cycles. In particular, the Sunday School Asset would be detrimentally impacted if the Debtor did not maintain its operations, as it is structured as a subscription model, with the most recent large shipment departing the Warehouse throughout August 2015. If the Debtor were to discontinue business operations and close its doors, customers previously purchasing the Sunday School Asset would immediately seek alternate providers of such services and materials, thus diminishing the saleable value of the Sunday School Asset to the mere liquidation value of any existing inventory.[6]

27. While continuing operations as a debtor in possession, the Debtor will continue to market its remaining assets. The Debtor intends to propose a liquidating Chapter 11 Plan, while selling certain assets in the near-term through Section 363 sales.

28. The Debtor has hired competent bankruptcy counsel to prepare its schedules, plans to comply with the United States Trustee monthly reporting requirements, and will propose a feasible chapter 11 plan of liquidation which will provide value to the estate for the benefit of creditors.

**The Secured Creditors**

29. The Debtor's two primary secured creditors that assert an interest in cash collateral are RRD[7] and Super G. The Debtor has a number of creditors with security interests in specific equipment and software. The Debtor does not intend to generate or use any cash collateral with respect to the lien interests of these other creditors.

30. The Debtor was initially indebted to Super G pursuant to a Promissory Note dated December 22, 2014, in the principal amount of $1,200,000, and a Business Loan & Security Agreement dated December 22, 2014, between the Debtor and Super G (*i.e.,* the Super G Loan). The Debtor's obligation under the Super G Loan is secured by a first priority security interest against substantially all of the Debtor's assets (the "<u>Super G Lien</u>")

---

[6] The Debtor estimates that this would reduce the value of the Sunday School Assets to 5-10% of their going concern value.

[7] In addition to RRD's secured claim, RRD also has an unsecured claim in the approximate amount of $1,990,159.42 pursuant to a forbearance agreement dated December 16, 2011, and a second unsecured claim in the approximate amount of $102,668.20 for invoice printing services.

1 pursuant to UCC-1 Financing Statements filed on December 31, 2014, and May 6, 2015.

2    31.    As of July 30, 2015, the Debtor estimates that the remaining amount owing under the Super G Loan is $692,371.84. RRD has signed a subordination agreement in favor of Super G as to the Super G Loan. On August 4, 2015, in contemplation of bankruptcy, the Debtor and Super G modified the Super G Loan by entering into a Loan Restructure, Discount Payoff and Cash Collateral Agreement (the "Cash Collateral Agreement"). Among other things, the Cash Collateral Agreement fixes the Super G Secured Claim at $655,000.00, and provides consent to the Debtor's use of cash collateral for a period of 120 days pursuant to certain terms.

32.    RRD asserts a secured claim against the Debtor's inventory that is located in RRD's Warehouse based on a statutory warehouseman's lien under Wisconsin law. The Debtor believes the outstanding balance of the RRD secured claim is approximately $55,034.53. RRD's asserted warehouseman's lien is junior to the Super G secured claim based on an agreement between Super G and RRD whereby RRD subordinated its security interest in the Debtor's assets to Super G's lien.

**The Debtor's Need for Immediate Access to Cash**

33.    The Debtor's immediate access to cash is absolutely critical to maintaining the Debtor's business operations, which in turn affects the going concern value of the Debtor's assets. At this time, the Debtor requires the use of cash to pay ordinary expenses associated with the Debtor's business operations, including, but not limited to, funding payroll and other employee-related obligations, and procuring goods and services necessary for operating without interruption. The maintenance of the Debtor's business operations, pending a sale of certain of the Debtor's assets, will preserve the value of the Debtor's assets to maximize the value that the Estate will receive in any sale, and the income generated by the Debtor through retail sale of its inventory and collection on its accounts receivable will allow the Debtor to fund its plan of reorganization.

///

34.  I am informed and believe that Super G asserts a secured interest in all the Debtor's assets (collectively, the "Assets"), and the rents, profits and proceeds therefrom (the "Cash Collateral"), and that RRD may assert a secured interest in any of the Debtor's inventory stored at the Warehouse (the "Inventory", which is a component of the Assets).

35.  A true and correct copy of the Debtor's projected cash flow and budget (the "Budget") for the months of August 2015 through, and including, November 2015, is attached as **Exhibit "A"** to the Cash Collateral Agreement, which is attached as **Exhibit "1"** to the Cash Collateral Motion.  The Budget contains the minimum expenses which the Debtor must incur to maintain its business operations at a level that will preserve and maximize the value of the Assets.  The Debtor currently has no present alternative source of funds to operate its business.

36.  The Debtor has reached an agreement with Super G, through the Cash Collateral Agreement, for use of the Cash Collateral through the end of November 2015.

**The Debtor's Request for an Order Limiting the Scope of Notice**

37.  The Debtor has approximately 600 creditors and parties in interest.  As serving each of these parties with every document in the Bankruptcy Case would impose heavy administrative and other burdens on both the Debtor, the Court, and the Clerk's Office, the Debtor has proposed, via the Motion to Limit Notice, a set of limited notice procedures.  I believe that these procedures will promote the orderly, efficient, and cost-effective administration of the Bankruptcy Case.

**The Debtor's Utilities**

38.  The Debtor receives essential utility services from several companies (the "Utility Companies") for the Office.  A list of the Utility Companies, the type of utility service received, and the Debtor's utility accounts for the Office is attached to the Utilities Motion as **Exhibit "A"**[8], which contains the known critical utility expenses for the Office.  The

---

[8] Although the Debtor believes that the list of Utility Companies set forth in **Exhibit "A"** is complete, the Debtor reserves the right to supplement the list if it determines that any Utility Company has been omitted. The Debtor further reserves all rights to challenge the status of any entity listed therein as a "utility" falling within the scope of 11 U.S.C. § 366.

Debtor requires continued and uninterrupted utility services for the Office, and such services are critical to Debtor's efforts to reorganize and to maximize the return to the estate's creditors.

39. The value of the Debtor's assets would be substantially diminished if the Debtor were to discontinue its business operations. Accordingly, in order to preserve the value of the Debtor's assets, the Debtor must continue to operate as a going concern, which necessarily requires uninterrupted utility services

40. The Debtor's Chapter 11 filing occurred during the middle of the billing cycles for many, if not all, of the Utility Companies. As a result, it is likely that there are outstanding pre-petition amounts owed to the Utility Companies. The Debtor has, and will have, adequate cash to meet all of its necessary post-petition operating expenses on a current basis, including payment to the Utility Companies. The Debtor has specifically included, in its budget amounts, payments to the Utility Companies, including the payments for the Utility Deposits (as defined in the Utilities Motion).

**The Equipment and Support Contracts**

41. Prior to the Petition Date, on or about August 24, 2012, the Debtor entered into a Master Lease Agreement with Varilease for telephone and computer equipment, software, and website programming and general maintenance and support (the "Master Lease Agreement"). The Master Lease Agreement, which is attached to the Rejection Motion as **Exhibit "A"**, contemplates entry into later "schedules" that constitute separate leases incorporating the terms of the Master Lease Agreement.

42. Also on or about August 24, 2012, the Debtor entered into a "Schedule No. 1" with Varilease (the "Schedule", attached to the Rejection Motion as **Exhibit "B"**), which was later supplemented with an "Amendment No. 1 to Schedule No. 1" (the "Amended Schedule", attached to the Rejection Motion as **Exhibit "C"**) (collectively, with the Schedule and the Master Lease Agreement, the "Equipment and Support Contracts").

43. The Equipment and Support Contracts have a three (3) year term. I am informed and believe that Varilease asserts this initial term did not begin until January 1, 2013 and thus does not end until the end of December 2015. I am further informed and believe that Varilease asserts that, because the Debtor did not provide a 180-day notice of cancellation or other election to Varilease pursuant to Paragraph 19(b) of the Master Lease Agreement, the Equipment and Support Contracts automatically renewed for another twelve-month term beginning on January 1, 2016.

44. The Equipment and Support Contracts, for which the Debtor is charged $4,513.62 per month, plus applicable sales/use tax, are no longer needed by the Debtor, who no longer utilizes the equipment and services that are the subject of the Equipment and Support Contracts.

45. It is my business judgment, as CEO of the Debtor, that continuing under the Equipment and Support Contracts would be burdensome and would provide no corresponding value or benefit to its estate, that no good reason exists to retain the Equipment and Support Contracts, and that rejection of the Equipment and Support Contracts is in the best interests of Debtor, its estate, and its creditors.

**The Debtor's Pre-Petition Employee Obligations**

46. Total unpaid pre-petition gross payroll and accrued vacation time for the Debtor's non-insider employees (the "Non-Insider Employees") is estimated to be $18,618.23 (the "Non-Insider Wages"). The Non-Insider Wages cover the period from July 25, 2015 to August 6, 2015 for hourly Non-Insider Employees; and August 1, 2015 to August 6, 2015 for salaried Non-Insider Employees. Paychecks are scheduled to be issued on August 14, 2015.

47. All such Non-Insider Wages are less than the statutory priority limit of $12,475 per employee. The Non-Insider Employees to be paid pursuant to the request for relief in the Pre-Petition Wages Motion are essential to the continuing business operations of the Debtor and cannot be readily replaced. Authorization of the payment of the Pre-

Petition Wages (as defined in the Pre-Petition Wages Motion) will greatly enhance employee morale, prevent employees from leaving the Debtor's employ, and facilitate a successful reorganization by permitting the business operations of the Debtor to continue with minimal interruption. The outstanding pre-petition wages and vacation time that the Debtor intends to pay are disclosed on the spreadsheet attached as **Exhibit "A"** to the Pre-Petition Wages Motion.

48. The Debtor's insider employees are Dave Thornton, Chief Executive Officer and Jane Greig, the Debtor's Vice President of Operations (the "Insider Employees") (collectively, with the Non-Insider Employees, the "Employees"). The Insider Employees are owed pre-petition priority wage and accrued vacation time of approximately $3,946.86 and $2,373.33 respectively (the "Insider Wages") (collectively, with the Non-Insider Wages, the "Employee Wages") for the pre-petition period of July 25, 2015 through August 6, 2015. The Insider Wages do not exceed the statutory maximum of $12,475, and the continued efforts of the Debtor's most senior management are crucial to the Debtor's reorganization efforts.

49. The Employee Overhead (as defined in the Pre-Petition Wages Motion) as it relates to the Insider Employees for the period from August 1, 2015 to August 6, 2015 totals approximately $900.00. The Employee Overhead as it relates to the Non-Insider Employees totals approximately $3,750.00 (approximately $2,600.00 for hourly Non-Insider Employees from July 25, 2015 to August 6, 2015, and approximately $1,150.00 for salaried Non-Insider Employees from August 1, 2015 to August 6, 2015).

///
///
///
///
///
///

50. the Employee Obligations which the Debtor seeks to pay total approximately $30,638.42, which breaks down as follows:

| | |
|---|---|
| Insider Wages | $6,320.19 |
| Non-Insider Wages | $18,618.23 |
| Insider Employee Overhead | $1,950.00 |
| Non-Insider Employee Overhead | $3,750.00 |
| **TOTAL** | **$30,638.42** |

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct. Executed August 10, 2015 at Ventura, California

*Dave Thornton*

DAVE THORNTON