CRAIG G. MARGULIES (SBN 185925)
NINA Z. JAVAN (SBN 271392)
**MARGULIES FAITH, LLP**
16030 Ventura Boulevard, Suite 470
Encino, CA  91436
Telephone:  (818) 705-2777
Facsimile:  (818) 705-3777
Email:  Craig@MarguliesFaithLaw.com
Email: Nina@MarguliesFaithLaw.com

Attorneys for  Gospel Light Publications
Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## NORTHERN DIVISION

| | |
|---|---|
| In re<br><br>GOSPEL LIGHT PUBLICATIONS,<br><br>        Debtor and Debtor in Possession. | Case No. 9:15-bk-11586-PC<br><br>Chapter 11<br><br>**DECLARATION OF DAVE THORNTON, CHIEF EXECUTIVE OFFICER OF DEBTOR, IN SUPPORT OF DEBTOR'S AND DEBTOR IN POSSESSION'S MOTION FOR ENTRY OF AN ORDER:**<br><br>**(1) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND**<br><br>**(2) APPROVING THE ASSUMPTION, ASSIGNMENT, AND SALE OF DESIGNATED CONTRACTS**<br><br>Hearing:<br>Date:<br>Time:<br>Place:    U.S. Bankruptcy Court, Ctrm 201<br>              1415 State Street<br>              Santa Barbara, CA 93101 |

I, Dave Thornton, hereby declare as follows:

1.    I am the Chief Executive Officer of Gospel Light Publications, the debtor and debtor in possession (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case"). I joined the Debtor in May 2013 as Director of Church Sales and was promoted to Director of Sales and Marketing in March 2014. Shortly thereafter, in August 2014, I was again promoted to my current position, in which capacity I continue to serve. I have over twenty (20) years experience in the publishing field, and have served in a number of managerial positions prior to my time at the Debtor. I have a B.A. in Speech Communications from Bethel University in St. Paul, Minnesota, and a Masters of Divinity in Christian Education from Trinity International University in Deerfield, Illinois.

2.    I make this declaration in support of the *Debtor's and Debtor in Possession's Motion for Entry of an Order: (1) Approving Sale of Substantially All Assets, Free and Clear of All Liens, Claims, Encumbrances and Interests; and (2) Approving the Assumption, Assignment, and Sale of Designated Contracts* (the "Sale Motion"),[1] which is filed concurrently herewith.

3.    In my capacity as Chief Executive Officer of the Debtor, I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. Accordingly, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

4.    The Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on August 7, 2015 (the "Petition Date"). The Debtor continues to carry out its business operations and manage its financial affairs as a debtor in possession. No trustee, examiner, or committee has been appointed in the Bankruptcy Case.

///

///

---

[1] Unless otherwise defined, all capitalized terms herein shall have the same meaning as in the Sale Motion.

- 1 -

**The Debtor and its Business Operations**

5. Founded in 1933, the Debtor is a mid-market Christian media company specializing in the production of print and digital media educational resources to meet the needs of church leaders throughout the world. The Debtor is particularly well-known for its high-quality Vacation Bible School and Sunday School curriculum materials. The Debtor serves approximately 14,000 customers per year, through a combination of direct sales (via website and phone orders) and distributors. A large portion of these customers are churches and schools.

6. The Debtor operates out of leased offices located at 1923 Eastman Avenue, Ventura, California 93003 (the "Office") which it has occupied since February, 2015. As of the Petition Date, the Debtor has trimmed its head count to 14 employees, some of whom have been with the Debtor since the 1980s. The Debtor's employees handle the Debtor's customer service, sales, marketing, and operations functions.

7. The Debtor's fulfillment and warehousing needs are met offsite by a third party, R.R. Donnelly & Sons ("RRD"). RRD provides warehousing, assembly and distribution services to the Debtor from a facility in Appleton, Wisconsin (the "Warehouse"). RRD also provides offsite printing services to the Debtor.

8. The Debtor's most significant assets are its Sunday School Curriculum (the "Sunday School Asset") [2], its Vacation Bible School Curriculum (the "Vacation Bible School Asset")[3], and its Ministry Resource Line (the "Ministry Asset").

9. The Sunday School Asset operates on a subscription model, with customers dependent on receiving new materials every three (3) months. The materials for the next shipment of the Sunday School Asset arrived in the Warehouse at the end of July 2015, with shipment of the assembled materials to customers estimated to be completed by the end of August 2015. Although it does not operate under the same model as the Sunday

---

[2] The Sunday School Asset had 4,220 direct customers in 2014 and generated total net revenue of $3,664,125.
[3] The Vacation Bible School Asset, which has impacted the lives of more than sixty-five million children since 1952, had 4,427 direct customers in 2014 and generated $2,055,396.00 in total net revenue.

- 2 -

School Asset, customers of the Ministry Asset are also dependent upon continuous services and the availability of resources provided by the Debtor.

### Events Leading to Bankruptcy

10. A number of unanticipated occurrences during the last nine months, combined with a long term slowdown in the Christian publishing market, led to the Debtor's need for Chapter 11 relief.

11. Prior to December of 2014, Crestmark Bank ("Crestmark") provided the Debtor with working capital ranging from $1,000,000.00 to $3,000,000.00 annually. In or around early November 2014, Crestmark notified the Debtor that it did not believe the Debtor would be able to satisfy certain loan covenants, which included retaining a $1,000,000.00 cash balance at all times, and provided the Debtor with notice that Crestmark would no longer provide working capital effective January 2015. At that time, the Debtor needed to find an alternate source of working capital to pay fulfillment invoices related to its Vacation Bible School line which were coming due in January 2015.

12. In December of 2014, the Debtor and Super G Funding, LLC ("Super G") entered into a short-term financing agreement whereby Super G provided the Debtor with a business loan in the amount of $1,200,000.00 (the "Super G Loan"). The Super G Loan allowed the Debtor to finalize the January 2015 production of the Vacation Bible School publication.

13. Shortly after entering into the Super G Loan, one of the Debtor's largest customers, Family Christian Stores, filed a Chapter 11 bankruptcy petition on February 11, 2015.[4] As a result of the Family Christian Stores' bankruptcy, the Debtor did not receive approximately $143,000.00 in expected income, which it was forced to write off.

14. In addition to the loss of the Family Christian Stores revenue, an issue with the Debtor's web developer also came to a head in February of 2015. In October of 2014,

---

[4] This case is pending before the United States Bankruptcy Court for the Western District of Michigan (Grand Rapids) as In re Family Christian, LLC, Case Number 15-00643-jtg (jointly administered with In re Family Christian Holding, LLC, Case Number 15-00642 and In re FCS Giftco, LLC, Case Number 12-00644).

the Debtor retained Bit-Wizards Information Technology Solutions, Inc. ("<u>Bit-Wizards</u>") to design a new, responsive website for the Debtor using a different software platform.

15.   Bit-Wizards originally estimated a project cost of approximately $160,000.00 and a projected "Go-Live" date for the new site of January 1, 2015. However, the new site was not deployed until February 14, 2015, by which time Bit-Wizards had billed almost $300,000.00, which was significantly over budget and more than the Debtor had anticipated. Further, the site continued to experience difficulties after deployment which, combined with the delayed launch, resulted in an estimated loss of $120,000.00 of anticipated revenue during the period from January 2015 to June 2015.[5]

16.   Finally, in late April 2015, Insperity PEO Services, L.P. ("<u>Insperity</u>"), the Debtor's employment services provider, changed the terms of the agreement with the Debtor by requiring the Debtor to begin pre-paying for payroll. This unanticipated modification to the agreement with Insperity further harmed the Debtor's cash flow by necessitating an immediate payment of $85,000.

17.   The combination of the foregoing events dropped the Debtor's cash balance in April 2015 to the point that it had to default on its payments under the Super G Loan. The Debtor was also unable to make certain payments under its long term obligation to its warehouse and fulfillment company, RRD. With the slowdown in the market for Christian publishing, the Debtor's management did not foresee a means of continuing to operate under its current business model. Thus, by late April 2015, the Debtor's management began actively exploring a liquidation strategy in order to maximize the value of its assets for the benefit of creditors.

**Pre-Petition Liquidation Efforts and the ZDL Sale**

18.   The Debtor's management has been actively involved in efforts to liquidate its various assets over the last 8 months. In December 2014, the Debtor's board of

---

[5] Sales through the website are particularly important to the Debtor's cash flow since they are largely credit card sales, which result in immediate payment of the amounts due, rather than payment on credit terms (*e.g.,* 30-day invoicing).

directors authorized me to explore the sale of the Debtor's membership interest in ZDL Holdings, LLC, a North Carolina Corporation ("ZDL"). ZDL does business in China publishing Christian literature and providing consulting services. The Debtor owns a sixty-three percent (63%) membership interest in ZDL (the "ZDL Asset"). I am informed and believe that Super G is the only entity asserting a security interest in the ZDL Asset.

19. I approached multiple Christian publishers[6] that expressed an interest in exploring this business opportunity. Although a pre-petition sale of the ZDL Asset could not be finalized, the Debtor was able to enter into an agreement (the "ZDL APA") to sell the ZDL Asset to ZDL's thirty-seven percent (37%) co-owner, Pacific Resources International, LLC ("PRI").

20. Pursuant to the ZDL APA, which contemplates the instant Bankruptcy Case, PRI will purchase the ZDL Asset for a total purchase price of $175,000.00 (the "ZDL Purchase Price"). Of the ZDL Purchase Price, $100,000.00 has already been paid to the Debtor as a good faith payment, and the remaining $75,000.00 is to be paid at closing.

21. The Debtor sought approval of the ZDL APA pursuant to a noticed motion under 11 U.S.C. § 363 (Dkt. No. 9), with the auction and sale hearing held September 22, 2015. The ZDL APA was approved by a court order entered September 24, 2015.

22. After the impact of the Family Christian Stores bankruptcy case, and once the difficulty in obtaining future working capital became apparent, in March 2015, the Debtor's board of directors me to pursue additional asset sales.

23. From March through July of 2015, I marketed the Debtor's assets by approaching all of the large Christian publishing companies to explore their interest in a purchase of some or all of the remaining assets.

///

---

[6] Due to Non-Disclosure Agreements signed by the various parties, the specific companies approached and/or whom seriously explored the possibility of purchase of the ZDL Asset are not identified by name here.

24.     Beginning in April 2015, the Debtor's management engaged in serious talks with a potential purchaser for the sale of substantially all the Debtor's remaining assets.[7] Although the Debtor ultimately received an offer from the potential purchaser in June 2015, it was determined both that the purchaser would not be able to complete its due diligence within a reasonable timeline, and that a sale of the Debtor's assets in smaller parcels would result in a greater return.

25.     Since mid-June 2015, the Debtor has solicited interest from other parties under an asset segregation strategy.  While none of these parties agreed to sign an asset purchase agreement prior to the instant bankruptcy filing, I believe that most would be active bidders in an auction in the Bankruptcy Case.

### The Debtor's Future Plans

26.     Through this Bankruptcy Case, the Debtor intends to operate its business to maintain the value of its assets while pursuing the sale of substantially all its assets.  The value of the Debtor's assets depends on the Debtor remaining a going concern through the Debtor's various sale cycles. In particular, the Sunday School Asset would be detrimentally impacted if the Debtor did not maintain its operations, as it is structured as a subscription model, with the most recent large shipment departing the Warehouse throughout August 2015.  If the Debtor were to discontinue business operations and close its doors, customers previously purchasing the Sunday School Asset would immediately seek alternate providers of such services and materials, thus diminishing the saleable value of the Sunday School Asset to the mere liquidation value of any existing inventory.[8]

27.     While continuing operations as a debtor in possession, the Debtor will continue to market its remaining assets.  The Debtor intends to propose a liquidating Chapter 11 Plan, while selling certain assets in the near-term through Section 363 sales.

///

---

[7] Due to a Non-Disclosure Agreement signed by the Debtor, this potential purchaser is not identified by name here.

[8] The Debtor estimates that this would reduce the value of the Sunday School Assets to 5-10% of their going concern value.

28.     The Debtor has hired competent bankruptcy counsel to prepare its schedules, plans to comply with the United States Trustee monthly reporting requirements, and will propose a feasible chapter 11 plan of liquidation which will provide value to the estate for the benefit of creditors.

### The Proposed Sale of the Auctioned Assets

29.     The Debtor is proposing to sell substantially all of its assets (*i.e.*, the Auctioned Assets). The Auctioned Assets will be sold free and clear of all liens, claims, rights, interests, and encumbrances in accordance with section 363(b) and (f) of the Bankruptcy Code. Outside of a plan, I believe that the consummation of the Sale to the Purchaser or one or more Successful Bidders will provide the Debtor and its creditors and other stakeholders with the best opportunity possible for maximizing value by realizing upon the Auctioned Assets through a Sale as a going concern, subject to further marketing efforts and consistent with the Bid Procedures attached to the Sale Motion as **Exhibit "E"**.

30.     The Debtor is selling the Auctioned Assets in the following packages:

   a. Package 1 (the "Sunday School Package"):

   i. The Sunday School Curriculum Asset, as described in pages 3 through 5 of the Asset Summary attached as **Exhibit "A"** to the Bid Procedures Motion and in the Asset Schedule attached as **Exhibit "B-1"** to the Bid Procedures Motion, and which includes the Assumed Contracts attached as **Exhibit "C-1"** to the Bid Procedures Motion (*i.e.*, the Sunday School Asset);

   ii. Inventory for current and future quarters of undated Sunday School material, as listed on page 5 of the Asset Summary (the "Sunday School Inventory");

   iii. The Church Ministry Resources Asset, as described on page 7 of the Asset Summary and in the Asset Schedule attached as **Exhibit "B-2"** to the Bid Procedures Motion, and which includes

Case 9:15-bk-11586-PC    Doc 94    Filed 09/29/15    Entered 09/29/15 20:57:59    Desc
Main Document    Page 9 of 11

the Assumed Contracts attached as **Exhibit "C-2"** to the Bid Procedures Motion (*i.e.*, the Ministry Asset);

  iv. Inventory of Church Ministry Resources, as listed on page 7 of the Asset Summary (the "Ministry Resource Inventory")

b. Package 2: The Vacation Bible School Asset, as described on page 6 of the Asset Summary and in the Asset Schedule attached as **Exhibit "B-3"** to the Bid Procedures Motion, and which includes the Assumed Contracts attached as **Exhibit "C-3"** to the Bid Procedures Motion (*i.e.*, the VBS Asset);

c. Package 3 (the "WTB Package"):

  i. The "What the Bible is all About" Asset, as described on page 8 of the Asset Summary and in the Asset Schedule attached as **Exhibit "B-4"** to the Bid Procedures Motion, and which includes the Assumed Contracts attached as **Exhibit "C-4** to the Bid Procedures Motion (the "WTB Asset"); and

  ii. Inventory of "What the Bible is all About", as listed on page 8 of the Asset Summary (the "WTB Inventory");

d. Package 4: Inventory for past Vacation Bible School programs, as listed on page 6 of the Asset Summary (the "VBS Inventory"); and

e. Package 5: Equipment and Furniture, as listed in the Asset Schedule attached as **Exhibit "B-5"** to the Bid Procedures Motion (the "FFE").

31. I believe the Auctioned Assets will garner the most value for the Debtor's bankruptcy estate if any sale is consummated by no later than November 2, 2015, as the beginning of the next sale cycle begins November 1, 2015.

32. The Debtor has proposed certain Bid Procedures for conducting the Auction. I believe the proposed procedures are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Auctioned Assets.

**The Proposed Sale to Cook**

33. Cook and the Debtor have entered into an "Asset Purchase Agreement" (the "Cook APA", attached as **Exhibit "F"**) to the Bid Procedures Motion, for the purchase of the Sunday School Package and the WTB Package (collectively, the "Cook Purchased Assets") for a total purchase price of $1,150,000.00 (the "Cook Purchase Price").

34. Among other things, the Cook APA requires Closing occur no later than November 2, 2015.

35. The Cook APA also requires a three percent (3%) Breakup Fee. I believe that the Breakup Fee is fair and reasonable in amount and is the product of good faith, arm's length negotiations between the Debtor and Cook. It has already encouraged competitive bidding in that Cook would not have entered into the Cook APA without this provision.

36. The Debtor is seeking approval of the sale of the Cook Purchased Assets to Cook, subject to higher and better bids at auction. The Cook APA is an exercise of the Debtor's business judgment and I believe that the Cook APA is in the best interests of the Debtor's estate, and is fair and reasonable.

37. To the best of my knowledge, the proposed sale to the Purchaser was negotiated in good faith, at arm's length, and without collusion or fraud of any kind. The parties to the Cook APA were represented by sophisticated counsel. The Purchaser is not an insider or affiliate of the Debtor. The proposed sale to Cook will be exposed to competitive overbidding, further ensuring that, to the extent the Purchaser is not overbid, it has paid a fair price for the Cook Purchased Assets.

**The Assumption, Assignment, and Sale of Designated Contracts**

38. The executory contracts listed in the Contract Schedules are Designated Contracts which have been selected by the Debtor for assumption, assignment, and sale along with the related Auctioned Asset (*e.g.*, the Designated Contracts related to the VBS Asset have been selected by the Debtor for assumption, assignment and sale along with

the VBS Asset).  The Debtor will file and serve on the affected nondebtor Counterparties to the Designated Contracts a schedule of Designated Contracts and proposed cure amounts, if any (*i.e.*, the Cure Notice), no later than twenty-one (21) days prior to the Sale Hearing, and Counterparties will have an opportunity to object to such proposed assumption and/or cure amounts as provided in the Bid Procedures Order.  A schedule showing the cure amounts that are to accompany the Cure Notice is attached as **Exhibit "G"**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 29, 2015 in \_\_Ventura\_\_, California.

_____
DAVE THORNTON

- 10